## STEELE v. KNOX.

1. Since the passage of the act of 1843, it is not necessary that the judge of the county court should *audit* the accounts of executors and administrators, previous to a final settlement.

2. The account filed by the administrator is open to be excepted to at the final settlement, and it is not necessary that exception should be taken previously; though that would be a convenient practice, and would prevent a continuance of the settlement by the administrator, if unprepared to answer the exception. The exception at the trial is not required, to be in writing.

3. An executor, or administrator, not authorized by the will, or by an order of court, has no authority to keep the estate together, and work the slaves on a plantation, and if he does so, the distributees may elect, whether they will take the profits, or charge him with the use of the property.

4. If the distributees elect to charge him with the use of the property, he must pay hire for the slaves, and rent for the land, according to the usual rule of hiring, and rent, and will be entitled to compensation for keeping such as are helpless.

5. It is the duty of an administrator, on obtaining an order of sale, to sell the perishable property without delay, and if he fail to do so, and retains it until it deteriorates in value, he is chargeable with its value, at the time it should have been sold.

6. The administrator may sell slaves when the interest of the estate requires it, though not necessary for the payment of debts, but if he should sell a slave unnecessarily, he is only responsible for the value at the time of the

Steele v. Knox.

sale; and if the sale was properly conducted and necessary, the price he actually sold for, would be the measure of damages, but in no case would the administrator be liable beyond the actual value at the time of sale.

7. The inventory is *prima facie* evidence against the administrator of the value of the assets, in the absence of all other proof of the value of the property.

Error to the Orphans' Court of Sumter.

THE plaintiff in error was appointed administrator, on the 27th of April, 1840, and at the same time, an order was made authorizing a public sale of the personal property of the estate, and an order for the sale of the crop of the deceased, privately.

On the 24th of May, 1844, the administrator was cited to settle his accounts, which was continued until the March term, 1845, when the record recites, that the administrator appeared and filed his account and vouchers for a final settlement, whereupon the court set a day for the settlement, and directed publication to be made, &c.

Upon the final settlement it appeared, that the administrator had, without any order of the court for that purpose, (though he alledged he was under the impression one was made,) kept the estate together and worked it, charging himself with the nett proceeds of the crops, instead of hiring out the slaves. That he neglected to sell any part of the personal property, until the first part of the year 1845, when he sold property to the amount of $406 56, and a negro man slave in the early part of the year 1844, and there appearing to the court no reason why any part of the personal property should have been sold, on motion of the distributees, the court disallowed the account filed, and charged the administrator with the hire of the slaves, and the appraised value of the property sold by him, the slave sold by the administrator having been appraized at $900, and sold at 560, and the other property at $653 50, and sold at 400 56, and rendered a decree against him for $10,179 82.

It was proven by the administrator, that the slaves, with the exception of two, were all of one family ; that the mother

77

had children rapidly, and was generally pregnant, or had one at the breast, and that it was right and proper that the mother and three youngest children should be kept together, and that the slaves, if taken by one person, would be worth to the hirer, ten per cent. less than might have been obtained from them if hired separately ; and that the estate would be benefitted in that ratio by their being kept together. But the court charged the administrator with the value of the separate hires, except the mother and the three youngest children.

The court held, the administrator was guilty of a *devastavit*, in keeping the property together for four years, without an order of the court for that purpose, and was chargeable with hire, and that there being no necessity to sell the slave, for the payment of debts, he was liable for his value, at the time of the appraisement, and charged him accordingly. To all which he filed an exceptive allegation, and now assigns for error—

1. In striking out the account of the plaintiff, and the stating of a new account by the court.

2. In charging the administrator with a *devastavit*.

3. In charging him with the rent of land and hire of slaves, instead of the crop made.

4. In charging him with the appraised value, instead of the actual value at the time of the sale.

5. In the mode of charging the hire of the slaves.

R. H. SMITH, for plaintiff in error.

The court had no power to strike out the administrator's account, and re-state it ; all it could do was, to act upon such exceptions as might have been filed. [Robinson and wife, et al. v. Steele, 5 Ala. 473; Douthitt's Adm'r v. Douthitt, 1 Ib. 594; Legatees of Horn v. Grayson, 7 Porter, 270.]

It was improper to compel the administrator to settle upon a different basis from that upon which his account was stated, no exception having been filed, and the distributees only insisting on it at the hearing.. Exceptions should have been filed before the hearing, so that the administrator might have known what he was to prove. See same authorities above cited, 2 Lomax, 320, § 2.

Steele v. Knox.

The court should, under the circumstances of this case, have allowed the administrator to account for the crops, he having kept the estate together under a supposition that he had an order of court to do so.

There is no statute compelling an administrator to hire the slaves, and keeping a plantation up is not like continuing a trade. The administrator had a right to keep the plantation in operation without an order, until the court should distribute. [2 Lomax, 284, § 21.]

The court could not have charged the administrator with more than the value of the property at the time he sold it. [2 Lomax's Ex. 323.]

The court had power to adopt the act of the administrator in keeping the estate together, and under the circumstances and facts of this case, should have done so. [2 Lomax, 283; Clay's Dig. 198, § 30; Ib. 300-1, § 21; 2 Lomax, 345-6.]

The administrator had a right to sell the personal estate, and he was the proper judge of the time to sell. The order was good till revoked.

Courts do not, in their dealings with an administrator, act upon the principle of subjecting him to every possible disadvantage that can benefit the estate. They act liberally with him, preserving at the same time the rights of the distributees.

In this view, the court should have allowed the administrator the ten per cent. proven to be in his favor, and in favor of the estate, by keeping the slaves together.

HAIR, contra.

If an executor fails to sell the goods, and they are taken by a trespasser, he shall pay the value of the goods, and not what he recovered of the trespasser, for he was in default in not selling in time. [2 Williams on Ex. 1022.]

Negligence of an executor, &c. makes him guilty of a *devastavit*. [2 Ib. 1104 and 1110.]

The administrator claims that the estate was kept together without the order of the court, and he offers to account for the crop made, &c. instead of hire for the slaves. [See Alexander v. Alexander, 8 Ala. Rep. 796.]

Solvent estates ought to be so represented by administrator and distributed.   [Clay's Dig. 196, § 22;  198, § 31.]

ORMOND, J.—Previous to the passage of the act of 1843, (Clay's Dig. 229,) when an administrator was cited to make a settlement of his accounts, he produced his vouchers to the judge of the orphans' court, by whom an account of the administration was  stated and recorded, and forty  days notice given of  the day of  the final settlement, that  all persons interested might examine it, and come prepared if necessary to contest it.   [Horn v. Grayson, 7 Porter, 273.]   The act cited above has altered the law, so far as to require the administrator, or executor, when it is necessary for him to make annual or final settlements, to file in the office of the clerk of the  orphans' court,  an account between  himself and the estate of which he has charge, together with the vouchers;  and thereupon it is made the duty of the court to appoint a day for the final settlement.

It is now  urged, that this account, when filed, is not open to objection unless exceptions are  filed  thereto in writing, at some  time  anterior to  the  final settlement, and the  case of Douthitt v. Douthitt, 1 Ala. 596, is relied on as an authority for this position.   The language of the court, in that case is, that  "the account would be open to exceptions in  the  same manner that the report of a master in  chancery is," but this was not a point necessary to be determined, or intended to be decided, and in the language just quoted, is stated merely as an analogy.   It was not intended to say, that this was the exclusive mode, but merely  to intimate that it was a convenient practice.

Be that however as it  may, it is clearly put at rest  by  the second section of  the act of  1843,  previously referred to, which provides, that  "at the time appointed in said order of publication for said settlement to be  made, or so soon  thereafter as the same is  regularly  reached,  the  said judge shall audit, and examine said account and vouchers, *and after hearing the objections to the same, if any are made,* and the evidence adduced, shall proceed to state the same,  and render a decree thereon."

It is, we think, perfectly obvious, that  it  was the intention

of the legislature, that the objections to the account filed by the administrator, might be taken at the final settlement. Nor is it necessary they should be in writing, but if either party wishes to have the action of the court thereon review-ed, it will then be necessary to spread them out upon the re-cord, together with the decision of the court upon them. If the administrator should be surprised by exceptions which he had not anticipated, and was not prepared with the necessary proof to sustain his account, the obvious remedy would be a continuance of the settlement, which, as the court meets at short intervals, would impose no particular hardship on the parties.

It is further urged, that on general principles of law, the administrator had the right to carry on the plantation, and work it for the benefit of the distributees, and that if he has done so in good faith, he is only responsible for the nett pro-fits. This is in one sense certainly an important question, but is entirely free from doubt. The personal representative does not represent the deceased, except so far as is necessary to wind up and close his business. A trade is not transmitted even to an executor, so as to enable him to carry it on, unless he has express authority by the will to do so, or is so empow-ered to act by a court of chancery ; and if he does so act, he will be responsible to the creditors, as well as to the heirs, and the latter may take the profits, or insist on a return of the capital, and interest, at their election. [Toller on Ex. 164, 267; Wightman v. Townroe, 1 M. & S. 412; Heath-cote v. Hulmer, 1 Jac. & W. 131; Ex parte Garland, 10 Ve-sey, 119; Barker v. Parker, 1 D. & E. 295 ; Ex parte Rich-ardson, 3 Madd. C. 79.] All the rules applicable to carrying on a trade by the personal representative, apply with full force to the continuance of a plaintation by the executor; and as to an administrator it is obviously impossible at com-mon law, as the land would descend to the heirs.

When we examine our statute regulations upon this sub-ject, we discover that the common law is recognized, and af-firmed. Thus it was provided, that when one dies after the 1st of January, the slaves which were engaged in making the crop, may be continued on the plantation during that year, and the crop will be assets in the hands of the personal represen-

tative. [Clay's Dig. 196, § 19.] And by the act of 1835, the power is conferred on the orphans' court to authorize the executor, or administrator, to keep the estate together, and work it for any term not exceeding ten years. [Ib. 198, § 30.] So also when an estate is free from debt, as was the case here, it is made the duty of the judge of the orphans' court, within three months after the estate is reported solvent, to cause distribution to be made among those entitled. [Ib. 196, § 22.] All these provisions are utterly hostile to the pretension here set up, and we cannot doubt that the action of the administtator, in keeping the estate together, and working the slaves on the plantation, was wholly unauthorized, and that as in the case of a trade carried on by an executor, or administrator, without authority, the distributees may elect, whether they will take the profits of the business, or charge the administrator with the use of the property—and this brings us to the consideration of the manner in which the account was stated by the court.

As this estate was free from debt, it was the duty of the administrator to return the fact to the court, that it might be distributed; his omission to do so, and retention of the property in his own hands for several years, was mal-administration, for the consequences of which he is chargeable. As the distributees have elected to charge him with the value of the use of the property, he must pay hire for the slaves according to the usual rates of hiring such slaves, in the customary mode during that period, and will be entitled to compensation for taking care of such as were helpless. And as he had the power to enter upon the land and rent it in virtue of the statute of 1839, he must be considered as having entered as administrater, and is therefore liable for the customary rent, in his official capacity, upon this settlement.

Our statutes regulating this subject, are evidently framed upon the supposition, that there shall be no sale of the personal property of a deceased, unless there is a necessity for it, and does not give to the administrator the exclusive right to judge of the necessity, but requires him to apply to the orphans' court for permission to sell, and authorizes the court to confer the power "when it may be necessary." [Clay's Dig. 223, § 13.] Such an order it appears was made in this

case, authorizing the administrator "to sell the personal property as the law directs."

It was certainly the duty of the administrator, on obtaining the order, without delay to sell the perishable property of the estate, and having failed to do so, and retained it without any justifiable cause for several years, and until it deteriorated, he is chargeable with its value at the time it should have been sold.

The sale of the slave presents a question of more difficulty. Our statute evidently contemplated a division of slaves in kind, when their sale is not necessary for the payment of debts, or unless they cannot be equally distributed. But the administrator, as the representative of the deceased, may certainly sell slaves when the interest of the estate requires it; as for example, when a slave from a spirit of insubordination, was difficult of management. In such, and in other cases which might be supposed, the administrator would certainly be justified in selling slaves, though not necessary for the payment of debts. It is not however necessary to pursue this subject further, because, conceding that the slave was sold without justifiable cause, the injury to the distributees would be his value at the time of the sale, and not his estimated value, at any previous period. The inventory of the estate, which the personal representative is required to make, would certainly be evidence against him, in the absence of all other proof of the value of the property. Here it appears a return was made of the sale of the slave, there is therefore no pretence for a resort to the secondary evidence of his value, afforded by the inventory, and the court erred in admitting it as evidence of the value of the slave. If the sale was justifiable, and made in the usual mode, the price for which the slave was actually sold, would be the measure of his value. But in no conceivable case, could he be charged beyond the actual value of the slave at the time of the sale. Let the decree of the orphans' court be reversed, and the cause remanded.