## IKELHEIMER *vs.* CHAPMAN'S ADM'RS.

[DETINUE FOR SLAVE, BY ADMINISTRATOR DE BONIS NON AGAINST PURCHASER FROM ADMINISTRATOR IN CHIEF.]

1. *How administrator must declare.*—The words "as administrators," following the names of the plaintiffs in the marginal statement of the parties, and in the commencement of the complaint, without an averment of the intestate's name, are mere surplusage, and do not indicate the character in which the plaintiffs sue.

2. *Variance.*—Under a complaint in detinue by an administrator, suing individually, a recovery cannot be had on proof of title in his representative capacity, when he has not had prior possession of the property.

3. *Amendment of complaint.*—Where the plaintiff is described in the summons as suing in his representative capacity as administrator, and in the complaint as suing individually, the complaint may be so amended, (Code, § 2403,) as to make it conform to the summons.

4. *Validity of grant of administration.*—An order of the probate court, granting letters of administration *de bonis non*, cannot be held void, in a collateral proceeding, because it does not show the appointment and removal, resignation or death of the administrator in chief.

5. *Jurisdiction of probate court to grant administration.*—The jurisdiction of the probate court, in the matters of the grant of letters testamentary and of administration, and of orphans' business, is founded on constitutional provisions, (Art. V, § 9,) and is original, general, and unlimited.

6. *Jurisdiction of probate court to order sale of personalty.*—The jurisdiction of the probate court, to order a sale of the personal property belonging to a decedent's estate, is derived solely from the statute, (Code, §§ 1743, 1796,) and is special and limited; consequently, it has no jurisdiction to make an order of sale, on the petition of the administrator, which does not specify the purpose and object of the sale. (STONE, J., *dissenting.*)

7. *Authority of administrator to sell personal property.*—In this State, an administrator has no authority to sell the personal property belonging to his intestate's estate, except under an order of court in the cases specified by law: the provisions of the Code, (§§ 670, 1743, 1796,) amount to an implied abrogation of his common-law right to sell.

APPEAL from the Circuit Court of Dallas.
Tried before the Hon. E. W. PETTUS.

THIS action was brought by James L. Evans and Thos. G. Portis, against Edward Ikelheimer. In the summons the plaintiffs were described as "administrators *de bonis non* of Ellen Chapman, deceased;" in the marginal statement of the names of the parties in the complaint, they were described as "Evans & Portis, as administrators, plaintiffs;" and in the commencement of the complaint it was averred, that "the plaintiffs, as administrators *de bonis non*, claim of the defendant," &c.; but the complaint did not otherwise show that they sued in their representative character. The action was brought to recover two slaves, which the defendant claimed under a purchase from the administrator in chief of said Ellen Chapman, at a public sale made by him under an order of the orphans' court. The defendant pleaded, in short by consent, *non detinet*, and *ne unques administrator;* and the trial was had on issues joined on these pleas.

On the trial, as appears from the bill of exceptions, the plaintiffs read in evidence their letters of administration, which were granted by the probate court of Dallas on the 16th December, 1856, and which were in the usual form. The defendant "objected to the introduction of said letters to the jury," without specifying any ground of objection to them, and reserved an exception to the overruling of his objection. The plaintiffs also proved title to the slaves in their intestate, possession by her at the time of her death in 1853, the defendant's possession at the commencement of the suit on the 19th December, 1856, the value of the slaves, and of their annual hire; that Benjamin Y. Beene was the administrator in chief of their intestate, and that he died in the summer of 1856. The defendant then proved the execution of the bill of sale for the slaves from said Beene, which was read in evidence to the jury without objection from the plaintiffs, and further proved, "that said slaves were sold publicly before the door of the post-office in Selma, on the 30th June, 1855; that said Beene, as administrator of Ellen Chap-

man, gave more than thirty days previous notice of the time and place of said sale, in a newspaper published in Selma; that said sale was made in conformity to said notice; that said·Beene was present at the sale, and one John M. Strong was the auctioneer; that there was an ordinary number of persons in attendance at said sale; that the defendant bid off said slaves at the sale, as the agent of A. Collenburger & Co., who had obtained a judgment against said Beene, as administrator as aforesaid, on an account contracted by said intestate in her lifetime, and to whom said bill of sale was made; and that the purchase-money therein specified was paid in full, partly by entering satisfaction of said judgment, and the balance in money."

The defendant then read in evidence to the jury, without objection on the part of the plaintiffs, several orders of the probate court in the matter of the estate of said intestate, which were in these words:

"Regular probate court, January term, 1854. Ordered, that Robert King, Hugh Ferguson, John J. Strowbridge, —— Reynolds and H. T. Baugh be, and they are hereby, appointed appraisers of the personal property belonging to the estate of Ellen Chapman, deceased, and that they make due return to this court of their proceedings in the premises."

"Regular probate court, January term, 1854. In the matter of the estate of Ellen Chapman, deceased. This day came Benjamin Y.Beene, and applied to be appointed administrator of the estate of Ellen Chapman, deceased; and thereupon entered into bond, in the sum of $10,000, with Stark Hunter and W. E. Ryder [as] his sureties, and took the oath prescribed by law. It is ordered by the court, that said bond, so taken as aforesaid, be approved and recorded. Ordered, that Benjamin Y. Beene be, and he is hereby, appointed administrator of said estate, and that letters of administration issue to him accordingly."

"Special probate court, February 6, 1854. In the matter of the estate of Ellen Chapman, deceased. This day came Benjamin Y. Beene, administrator of said estate of Mrs. Ellen Chapman, deceased, and returned an appraise-

ment. This day came Benjamin Y. Beene, administrator of said estate, and applied for leave to sell the personal property belonging to said estate: It is therefore ordered by the court, that said administrator have leave to sell the personal property belonging to said estate, on a credit of six months, after giving thirty days notice as required by law, and that he make due return according to law, &c."

"Special probate court, February 9th, 1854. In the matter of the estate of Ellen Chapman, deceased. This day came Benjamin Y. Beene, administrator of the estate of Ellen Chapman, deceased, and applied for leave to sell the perishable property belonging to said estate. It is therefore ordered by the court, that said administrator have leave to sell the same on the premises, on a credit of six months, after giving thirty days notice of the time and place of sale, and that he make due return of such sale to the court within two months thereafter."

"Regular probate court, December 16th, 1856. This day came James L. Evans and Thomas J. Portis, and applied to be appointed administrators *de bonis non* of the estate of Ellen Chapman, deceased; and thereupon entered into bond, in the sum of $3,000, with E. Y. Ulmer as their surety, and took the oath prescribed by law. It is therefore ordered by the court, that said bond, so taken as aforesaid, be approved and recorded. Ordered, that James L. Evans and Thomas G. Portis be, and they are hereby, appointed administrators *de bonis non* of said esaate, and that letters of administration issue to them accordingly."

This being all the evidence in the case, the court charged the jury, "that said Beene had no authority, by virtue of his appointment as administrator by the probate court of Dallas, to sell said slaves; that the orders of said court read in evidence, bearing date the 6th and 9th February, 1854, conferred no authority on said Beene, as administrator as aforesaid, to sell said slaves; and that the order of said court, appointing plaintiffs administrators *de bonis non* of said estate, and the letters thereon issued, both of which were read in evidence, were valid, and conferred

on plaintiffs the authority to act and sue as administrators *de bonis non* of said intestate."

The defendant excepted to this charge, and asked the court to instruct the jury, "that if they believed the evidence, they must find a verdict for the defendant;" which charge the court refused to give, and the defendant excepted.

The charge given by the court, and the refusal to charge as requested, are now assigned as error.

BYRD & MORGAN, for the appellant.

ALEX. WHITE, and N. R. H. DAWSON, *contra*.

WALKER, J.—The judgment in this case must be reversed, because the words "administrator," in the marginal description of the case accompanying the complaint, and the words "as the administrators *de bonis non*" in the complaint, are unmeaning and useless, without a statement showing of what estate the plaintiffs are administrators. The complaint can not be aided by reference to the summons, especially as there is no word of reference in the complaint to the summons. The court should have regarded the complaint as by the plaintiffs in their individual capacity, and charged the jury, if they believed the evidence, to find for the defendant.—Crimm v. Crawford, 29 Ala. 623; Agee v. Williams, 27 Ala. 644; Gibson v. Land, 27 Ala. 117. The defect in the complaint can be amended in the court below, as it in all probability would have been on the trial, if the attention of the court had been called to the point.

Anticipating an amendment of the complaint, and passing upon the merits of the case made by the evidence, as did the court below, we decide, that the plaintiffs' letters of administration were valid; that the sale under which the defendant claims was void, and that the plaintiffs have a right, in their representative capacity, to recover the property.

The order of the probate court of Dallas county, appointing the plaintiffs administrators *de bonis non*, does not recite any jurisdictional fact. That omission does not

authorize the court to treat the order as void, on a collatteral impeachment. By the constitution of the State of Alabama, (Art. V, § 9,) the general assembly is invested with power to establish in each county within this State a court of probate, for the granting of letters testamentary and of administration, and for orphans' business. The probate court has, by virtue of this provision of the constitution, a specific grant of unrestricted jurisdiction over the granting of letters testamentary and of administration. It is, therefore, as to those subjects, a court of general jurisdiction. Its jurisdiction is, thus far, of constitutional, not statutory origin. As soon as the court was created, that jurisdiction attached, without the aid of a statute. The constitution, as to those subjects, bestows a jurisdiction which is original, unlimited and general.

The grant of jurisdiction over orphans' business does not invest the court with authority to order the sale by the administrator of personal property. It required a statute to bring the subject of the sale of personal property within the jurisdiction of the court. No power appertained to any court to make such an order, until it was bestowed by the statute. It is said in the case of Wyman v. Campbell, 6 Port. 232, that legislation is the only source, whence the orphans' court derived its jurisdiction to order the sale of lands; and, as to that subject, it has been invariably held a court of limited jurisdiction. The power to order a sale of personal property is equally the creature of the statute, and a distinction between the two is without reason. The court of law has, by virtue of a statute, jurisdiction over garnishment, to be exercised in a mode prescribed; and it is deemed, as to that matter, a court of special jurisdiction.—Gunn v. Howell, 27 Ala. 663. It is clear to our minds, that the probate court, in ordering a sale of personal property, exercises a special power conferred by a statute, which prescribes the circumstances under which it is to be exercised; and we are bound either to decide that it is, *quoad hoc*, a court of special jurisdiction, or to abrogate a principle which runs through all of our cases, with, perhaps, a single exception,

44

from Minor's Reports to 29 Alabama, and which has a universal sanction in the English common law. We refer to our decision in Wyatt's Adm'r v. Rambo, 29 Ala. 517, for a collection of the cases, and a fuller discussion of the subject.

Under section 1743 of the Code, the jurisdiction of the court is dependent upon the fact, that the administrator makes application to sell for the payment of debts. It is certainly not enough to authorize the court to sell, that the administrator makes an application. The application to sell must be for the purpose authorized by law. Such is the necessary result of the decisions of this court on kindred questions.—See the cases collected in Shepherd's Digest, 136 and 137.

There is no distinction between the character of the jurisdiction which the probate court exercises over the appointment of administrators and of administrators *de bonis non*. The duties of an administrator were first created by the statute 13th Edward I, ch. 19. Until the enactment of the statute 31st Edward III, ch. 11, the ordinary was the administrator. That act directed the appointment of the friends of the deceased. By the statute 21st Henry VIII, ch. 5, the appointment was directed to be made from the next of kin. Under it, the ecclesiastical courts appointed administrators *de bonis non*, as well as administrators in chief. There never was a time when, upon the death of an administrator, the trust passed to his representative. The executor of an executor was the executor of the first testator; but the case was different as to administrators. The reason for this difference was, that upon the payment of debts and legacies, the surplus of the goods belonged to the executor *proprio jure*, and the authority of the executor was founded on the special confidence of the testator. On the other hand, the administrator was but an officer, on whom the deceased had imposed no trust or confidence.—Vaughan, 182; 2 Bla. Com. 506; 1 Petersdorf's Abr. 247; 4 Bac. Abr. 23, *Ex'rs and Adm'rs*, B. 2; Went. on Ex'rs, 215. Under the English law, the authority to appoint administrators embraced administrators *de*

*bonis non.* So the provision of the constitution, which gives jurisdiction over the grant of administrations, includes administrations *de bonis non.*

We do not assent to the position taken for appellant, that the administrator still has his common-law power to sell the personalty of his intestate, without an order of court. That power is taken away by necessary implication. If sections 1743 and 1796, which authorize orders to sell for the payment of debts and for distribution, do not, of themselves, take away the power of voluntary sale, which appertained to the administrator at common law, there is no room for doubt that it is taken away by other provisions of the Code. Section 670 of the Code gives the probate court jurisdiction over the sale of personal property, in the cases defined by law. Other sections define the cases in which the jurisdiction is to be exercised, and those cases are the only ones in which an administrator could sell, without the commission of a *devastavit* at common law. It is thus shown, that the jurisdiction to order sales, in all the contingencies required in the progress of the administration, is given to the probate court, which must have the effect of denying the power to the administrator.

There is another argument by which the conclusion must be attained, that the power of sale without an order is denied to the administrator. It is a correct principle, that the common law relative to any subject is superseded by a revision of the whole of that subject by the legislature.—Commonwealth v. Cooley, 10 Pick. 37; Sedgwick on Statutory and Constitutional Law, 126. The legislation of this State, found in the Code, in reference to the sale of the personalty of the estates of intestates, covers the entire ground, is a revision of the entire subject, and is evidently designed to place it altogether under statutory control. For this reason, the common-law power of an administrator to sell *ad libitum* must be regarded as taken away.

The judgment of the court below is reversed, and the cause remanded.

STONE, J.—As this case, in a material point of view, rests on the case of Wyatt v. Rambo, 29 Ala. Rep. 510, in which I did not sit, I propose in this opinion to express my views of, and to dissent from, both that case and this. In doing so, I will be compelled to discuss the subject somewhat in detail.

The *office* of administrator was created in England by the statute 31st Edward III, ch. 11. The powers of administration had been previously exercised, at different times, by the ordinary and the clergy; and hence, the statute did not create the *functions* of the administrator, but merely the *agent* by which those functions were to be performed.—2 Kent's Com. (8th edition,) 508. The office being created, and the administrator appointed to fill it, he became the personal representative of the intestate, as an executor was the personal representative of a testator; and there attached to his office certain powers and duties.

In 13th Edward I, it was enacted, that the ordinary, who then had charge of deceased intestate's effects, should pay the debts against such estate, so far as the goods of decedent extended. In Snelling's case, 5 Rep. 82, it was resolved, that if the ordinary took the goods into possession, he was chargeable with the debts of the intestate *at common law.*—1 Lomax on Executors, (2d edition,) 260. In 2 Kent's Com. (8th edition,) 515, speaking of administrators, it is said, "His powers and duties, under the common law of the land, may be summarily comprehended in the following particulars: 1. He is to make an inventory," &c. On p. 517 it is said, "After completing the inventory, the duty of the administrator is, to collect the outstanding debts, and convert the property into money, and pay the debts due from the intestate. He must sell the personal property, so far as it may be necessary for the payment of debts and legacies, beginning with articles not required for immediate family use, nor specifically bequeathed." The distribution of the personal estate is of purely statutory origin.—2 Kent's Com. 525.

It cannot be controverted, that in the absence of statutes passed by our own legislature, the administrator had

power to sell the property of intestates, publicly or privately, either with or without an order. His appointment vested in him the *title* to the personal estate of his intestate; and that ownership, with the power of disposition, was untrammeled.—2 Williams on Executors, 602. "It is a general rule of law and equity, that an executor or an administrator has an absolute power of disposal over the whole personal effects of the testator or intestate; and that they cannot be followed by creditors, much less by legatees, either general or specific, into the hands of an alienee."—Whale v. Booth, 4 T. R. 625; Nugent v. Giffard, 1 Atk. 463; 1 Lomax on Executors, (2d edition,) 560, 558, 559, 561.

The doctrine was well settled at the common law, that an executor or administrator could apply the assets of the estate to the payment of his own debts; and this right was not limited to mere money assets. It extended to a mortgage term of the testator.—Mead v. Lord Orrery, 3 Atk. 235; 2 Williams on Executors, 602; 1 Lomax on Executors, 558–9. In Whale v. Booth, Lord Mansfield said, "Assets of an estate cannot be followed into the hands of the vendee of an executor or administrator, unless there be fraud in the sale. If, at the time of the alienation, the purchaser knows they are assets, this is no evidence of fraud." The case of McLeod v. Drummond, 14 Vesey, 359, (S. C. 17 Vesey, 153,) although perhaps the strongest English case against the doctrine, does not deny the right of the executor to pledge assets for the payment of his own debts. " On a sale of assets by an executor, the purchaser is, generally speaking, absolved from all inquiry with respect to debts and legacies. The law gives the executor the power of sale for the payment of debts; his sale may be presumed to be made for that purpose; and that presumption sustains the authority of the executor, and gives protection to the purchaser." 1 Lomax on Executors, 560–1; Mead v. Lord Orrery, 3 Atk. 235.

Having ascertained what was the common-law doctrine on this question, let us next consider, what changes or innovations were introduced by the act of 1809. We

will, perhaps, best understand the intention of the legislature, and the meaning of the language found in this statute, by a brief review of our legislation on this subject. Their intention is much better ascertained by considering the law as it then stood, than by considering the entire system as now perfected. That intention, if we can ascertain it, should be with us a governing principle, and we should construe this statute as we would have construed it, had it been brought before us the day after its enactment.

The first enactment on this subject was approved March 12, 1803.—Toul. Dig. 324. Section twenty provided for the appointment of administrators. Section twenty-one, after defining the general powers of the chief-justice of the orphans' court, declared as follows: "And whenever he [the chief-justice of the orphans' court] may deem it necessary to appoint an administrator, or administrators, to collect together the goods of the deceased, for the purpose of depositing them in the hands of the said chief-justice, out of which he shall pay the debts of the deceased, and be liable in law as other administrators."

There was no statute, changing or altering this in any particular, until December 3, 1810, when the clause of the act of 1803 above copied was repealed.—Toul. Digest, 180, § 4.

The powers of the administrator, then, with the exception of the change wrought by the act of 1803, *supra*, remained substantially as they were at common law, until and up to the enactment of the statute of 1809, Clay's Dig. 223, § 13; Toul. Digest, 334, § 1.· That statute was introductive of entirely new rules.

In Heydon's case, 3 Rep. 8, it was resolved by the barons of the exchequer, "that for the sure and true interpretation of all statutes in general, (be they penal or beneficial, restrictive or enlarging of the common law,) four things are to be discussed and considered: 1. What was the common law before the making of the act? 2. What was the mischief and defect for which the common law did not provide? 3. What remedy the parliament hath resolved and appointed to cure the disease of the

commonwealth ? and 4. The true reason of the remedy ? "
In Huffman v. The State, 29 Ala. R. 40, we applied these
rules of construction to a statute which made an indicta-
ble offense out of an act theretofore indifferent : a mere
*malum prohibitum.* If these rules were correctly applied
to the case cited, they are certainly not inapplicable to
the act of 1809, which is remedial in its character.

Let us apply these rules to the act of 1809. We have
shown above what the common law was on this subject.
Centuries of abuse, growing out of the power of the exec-
utor or administrator to sell or pledge the property of the
estate privately, or even to apply it to his own purposes,
disclosed the mischief and defect for which the common
law did not provide. This mischief and defect were rem-
edied, when the legislature declared, "It shall not be
lawful" for any personal representative "to take the
estate, or any part thereof, at the appraised value, or to
dispose of the same at private sale."—Toul. Dig. 334, § 1.
This was the remedy which the legislature *resolved and
appointed to cure the disease.* What, then, is the *true reason*
why the legislature declared, " it shall be the duty of the
executor, administrator," &c., " to apply to the orphans'
court of their county for an order of sale," &c. Wyatt v.
Rambo makes this *application* by the administrator, the
*jurisdictional fact ;* and because the record in that case did
not recite such application, the order of sale, and the sale
under it, were pronounced void, though the question arose
collaterally.—29 Ala. 510.

My understanding of the theory of the opinion in Wyatt
v. Rambo, is this : Although the orphans' court may grant
an order to sell personal property, and although the admin-
istrator may sell under such order when properly granted ;
yet, it is necessary to the validity of the order that it
shall appear to have been granted on the application of
the administrator. Now, when it is remembered that the
statute we are considering was the first enactment which
required, or even authorized, an order of sale ; and that
before that time the administrator had an unlimited power
of sale without such order, I do not think the above is the
true theory of the statute. Abuse of power by the admin-

istrator, not by the orphans' court, was the mischief which the statute was designed to remedy, as its language clearly imports.

Again : The act of 1809 subordinates the administrator to the orphans' court, in this, that it forbids him to sell without obtaining the sanction and permission of that tribunal. He does obtain its sanction and permission, and sells under its order. The opinion of my brothers in Wyatt v. Rambo holds the sale void, because the permission was given apparently without being asked for.

When I speak of an application to be made by the administrator, I do not, of course, mean to charge that any sort of application would do. In Wyatt v. Rambo, the record failed to show that any application had been made. The question was not *what* the application should contain, but whether the silence of the record on the subject of an application invalidated the order.

Wyatt v. Rambo does not hold that an order to sell personal property would be invalid, if it failed to affirm that a necessity existed for the sale. It leaves that question open; declaring that " it is unnecessary to inquire whether the application of the administrator and the necessity must both be shown, or whether the jurisdiction is maintainable in the absence of either." If it had affirmed that an order to sell personal property, which did not affirm the necessity for a sale, would have been pronounced void in a collateral proceeding, and this notwithstanding the record recited that application had been made, it would have overturned an unbroken chain of decisions of this court, commencing with Wyman v. Campbell, 6 Porter, 242, and ending with King v. Kent, 29 Ala. 542, which collects most of the authorities. The rule is, that after jurisdiction attaches—which takes place on the presentation of a proper petition or application— all the after proceedings are mere questions of irregularity. For such, the order might be reversible on direct appeal; but coming up collaterally, they avail nothing. This being the rule in cases for the sale of land, of course we could not require greater strictness in sales of personal property.

The first clause of the act of 1809 is negative in its terms.  Its language is, "It shall not be lawful for any executor or executors, administrator or administrators, guardian or guardians, to take the estate, or any part thereof, of any testator or intestate, at the appraised value, or to dispose of the same at private sale, except when the same is directed by the will of the testator." This clause is prohibitory in its terms, and, to the extent of its provisions, takes away these common-law powers of the personal representative.  Any act in violation of this clause would be necessarily void.—Weir v. Davis, 4 Ala. 442 ; Fambro v. Gantt, 12 Ala. 305 ; Ventris v. Smith, 10 Peters, 174–5.  The other provisions of this section, except those which prescribe the *length* of notice of sale, and the *terms of credit*, are affirmative in form, without any prohibitory words.  The rule is, that affirmative statutes, or affirmative clauses in a statute, do not necessarily repeal the common law, but are either directory or cumulative, dependent on the nature of the subject.

The legislature, in clear language, declared these disabilities.  If they had intended to impose others, nothing would have been easier, or more natural, than that they should have expressed that intention.  Their minds were directed to the subject, and they knew how to express prohibitions.  If they believed that administrators should be prohibited from selling property, until they had *applied* for an order, should they not have said so in terms ?  Is not the fact that they expressed certain prohibitions, and omitted others, strongly persuasive to show that the omission was intentional ?  *Inclusio unius est exclusio alterius.*

Another view : In 1809, no statute had been passed directing or authorizing a petition, application, personal notice, or formal trial, preliminary to a sale of either real or personal property.  That statute contained no such provisions.  True, the act of 1803 (Toul. Dig. 327, § 28) had provided for a sale of real estate in a class of cases ; but it provided none of the machinery mentioned above.  The court, under that statute, acted of its own accord, without petition or application from any body, except the oath of

the administrator, exhibiting "a true account of the said personal estate and debts, so far as he can discover the same." If after posting up notice, as the act requires, no reason was shown why the sale should not be ordered, the court proceeded to "examine the allegations and proofs," and made the order accordingly. It was not necessary to mention who were the heirs, devisees or next of kin, and no actual notice to any body was necessary. If any person, learning that proceedings were on foot for granting an order of sale, should come in under the notice posted up, "directing all persons interested in the lands, &c., to appear before the orphans' court," on a certain day therein to be named, then an issue could be made up. Otherwise, the whole proceeding was *ex parte*.

In regard to the sale of personal estate, there never was a statute requiring a formal application, or notice of application, until by the Code, §§ 1743, 1744, the law was changed. These sections declare that, when application is made to sell slaves, publication is required similar to the provisions of the act of 1803, for the sale of land.

The act of 1818, Toul. Dig. 338, and the act of 1822, Toul. Dig. 347, require petitions preliminary to the granting of an order to sell lands to pay debts, or for more equal distribution. These statutes provide for formal notice—an issue, and regular trial. This is the first mention of petitions to obtain an order of sale, which can be found in our legislative history. I submit the following reflections, based on this legislative history :

The act of 1803, in reference to the sale of land, provided for posting up notices, setting a day for trial, hearing proofs, &c. The act of 1809 requires no notice, no proof, and evidently contemplates immediate action by the court, when the subject is brought before it. Why under the act of 1809 require that the application shall be made by the administrator, or rather, that the record shall affirm such to have been the case ? No trial, no contest, no conceivable result can flow from it, and the legislature certainly did not intend to require a useless and fruitless ceremony. Moreover, the silence of the act of 1809 on the question of notice, proof, &c., while the act of 1803

required publication and the setting of a day for trial, is a strong circumstance to show that, under the later statute, nothing of the kind was contemplated.

If it be asserted or contended that the act of 1809 contemplates proof, and the ascertainment by the orphans' court of the necessity for a sale, then it results that the court is required to consider and determine the question without any means of forming an issue, bringing out evidence, or known mode of learning the facts. This will leave him to grope his way on his own knowledge, or on *ex-parte* and extra-judicial oaths.

For fifteen years, commencing in 1803, and ending in 1818, no formal petition or application was necessary to obtain an order for the sale of land. If the doctrine asserted in Wyatt v. Rambo be correct, for nine of those years a more formal application was necessary to obtain an order to sell personal property, than to obtain a like order to sell real estate. I have not been able to adopt the argument or conclusion stated in Wyatt v. Rambo.

I have said that we must consider and construe this statute as we would have done the day after its enactment. Any change of our system since that time will not authorize us to change its construction. Taking, then, the year 1809 as a stand-point for its consideration, I think the following is a just paraphrase of its provisions:

It shall not be lawful, as heretofore, for the administrator to take the estate of his intestate, or any part of it, at its appraised value, or to dispose of the same at private sale; but when a sale of all, or any part of it, is necessary for the payment of debts, he shall go to the orphans' court and obtain an order, before he shall be permitted to sell.

Should the question be asked, why was it made necessary to obtain the order of the orphans' court, before selling personal property; the answer is, that the legislature may have been unwilling to trust the question of a sale *vel non* to the exclusive judgment and discretion of the administrator; or, they may have thought it necessary to have the approbation of a sworn, judicial officer, before property of an intestate should be sold. At that time,

neither executors nor administrators were sworn; and it was certainly safe to presume that the judges of the orphans' court could be more trusted, than administrators as a class could be. Or, they may have intended, by requiring an order, to spread the facts on the record of the court. The order of sale, and the sale bill which the administrator was required to return, would afford evidence on which to charge him.

As I understand the act of 1809, it clothed the orphans' court with a power to be exercised on an exigency, and provided no form, machinery, or means for ascertaining and determining the existence of that exigency. In such case, the exercise of the power is itself the ascertainment of the existence of the exigency.

In the great case of Martin v. Mott, 12 Wheat. 19, the act of congress of 1795 came up for construction. That act declared, " that whenever the United States shall be invaded, or be in imminent danger of invasion from any foreign nation or Indian tribe, it shall be lawful for the president of the United States to call forth such number of the militia of the State or States most convenient to the place of danger, or scene of action, as he may judge necessary to repel such invasion, and to issue his order for that purpose to such officer or officers of the militia as he shall think proper." Under this act, the president of the United States made a requisition on Gov. Tompkins of New York, requiring him to furnish certain militia; and, so far as the record discloses, the requisition did not recite that the country was *invaded*, or *in danger of invasion*. The governor thereupon detailed certain parts and portions of the militia of the State, pursuant to the requisition of the president; and one Jacob E. Mott, being detailed and ordered into service pursuant to said requisition, failed and refused to do military duty. Thereupon a fine was assessed against him by a court-martial, and the proper officer seized his goods for the satisfaction of said fine. He brought an action of replevin against Martin, the deputy-marshal, for seizing and detaining his goods. The defendant filed his avowry, setting forth the proceedings in detail, averring that they were had " upon the

previous requisitions of the president of the United States, for that purpose made, and to him [Gov. Tompkins] directed."

To this avowry the plaintiff demurred, and, among other causes of demurrer, assigned that—

"The said defendant, in his said avowry, does not allege that the president of the United States had adjudged that there was an invasion, or imminent danger of an invasion; or that any of the exigencies had occurred, in which the president is empowered to call out the militia, by the constitution of the United States."

Judge Story delivered the unanimous opinion of the court, overruling the demurrer to the defendant's avowry. In delivering the opinion, which is a very elaborate one, among other things he said : "He [the president of the United States] is necessarily constituted the judge of the existence of the exigency in the first instance, and is bound to act according to his belief of the facts. If he does so act, and *decides to call forth the militia*, his orders for this purpose are in strict conformity with the provisions of the law; and it would seem to follow as a necessary consequence, that every act done by a subordinate officer, in obedience to such orders, is equally justifiable. The law contemplates that, under such circumstances, orders shall be given to carry the power into effect; and it cannot, therefore, be a correct inference that any other person has a right to disobey them. The law does not provide for any appeal from the judgment of the president, or for any right in subordinate officers to review his decision, and in effect defeat it. Whenever a statute gives a discretionary power to any person, to be exercised by him upon his own opinion of certain facts, it is a sound rule of construction, that the statute constitutes him the sole and exclusive judge of the existence of those facts."

In Vanderheyden v. Young, 11 Johns. 150, a similar question arose, and was decided in the same way.

In Stuyvesant v. The Mayor, &c., of New York, 7 Cow. 588, a question arose on the validity of a by-law of the city of New York. The act of incorporation empowered the city authorities to pass such by-laws as they, "from time

to time, should deem necessary and proper," &c.,   *   *   *
"and for regulating, or, if they find it necessary, prevent-
ing the interment of the dead within the said city." The
by-law in question was passed, without adjudging or recit-
ing that it was necessary, or that the common council
found it to be so. It was contended that the by-law was
void. The case, with several others involving the same
question, was elaborately argued. The court ruled, "that
the by-law need not recite or adjudge, on its face, that.it
was *necessary;* but such necessity was implied by the act
of passing it."

In pronouncing its decision, the court referred approv-
ingly to the case of Martin v. Mott, *supra,* and observed
that "the president [of the United States] was constitu-
ted by the act the exclusive judge of the exigency; that
the requisition was not only conclusive evidence that he
had passed as a judge upon the case; but that a plea of
such requisition implied, and was equavalent to an express
averment of adjudication."

To the same effect is Wyatt v. Steele, 26 Ala. 639.

I can perceive no distinction in principle between the
cases collated above, and the case of Wyatt v. Rambo.
In each case, an officer or officers were clothed with
authority to do certain acts upon certain exigencies; and
in neither case were any rules prescribed, or form given,
for determining the existence of the exigency. The per-
formance of the act is evidence that the exigency has
arisen.

In coming to this conclusion, I think I but follow the
whole current of our decisions, with the exception of
Wyatt v. Rambo. In Steele v. Knox, 10 Ala. 614, the
question was distinctly made that the administrator ought
not to have sold the slave, *the estate being free from debt.*
The sale was upheld, and the administrator was charged
only with the price which the slave *actually* brought. I
have looked into the record in that case, and find it cor-
responds *in every material respect* with the record of
Wyatt's estate. The order of sale was granted on the
same day on which the administrator was appointed; and
the record does not recite either the *application* or *necessity*

for a sale. So far as the record discloses, the order was granted *ex mero motu*.

In Steele v. Knox, *supra*, the court indulged the remark, that the administrator is not the sole judge of the necessity of a sale. A similar idea is intimated in Lay v. Lawson, 23 Ala. 389. No authority is cited in support of this position, and the court in neither case granted or withheld any relief predicated on this question.

Admit, however, that this court was right in the principle asserted, and what does it lead to? Proof that the necessity did not exist will not render the sale void; for that precise question arose in the case of Steele v. Knox —the very case in which the doctrine was first asserted. The only effect of the establishment of this principle is, to show that the orphans' court was charged with the ascertainment of the existence of a necessity for a sale. This will furnish another, and perhaps the most satisfactory reason, why the legislature required the administrator to obtain an order of the court before he made sale of the property. It also demonstrates the applicability of Martin v. Mott, and Stuyvesant v. Mayor, &c., of New York, cited *supra*, to the facts of the case of Wyatt v. Rambo.

The case of Calhoun v. McCartney was wholly unlike Wyatt v. Rambo. In that case, the statute of Georgia, under which the sale was made, prohibited a sale of slaves by an administrator, unless the other personal property, with the hire of the slaves for one year, should prove insufficient for the payment of debts. Moreover, the administrator had himself purchased the slaves at his own sale, and had made no payment. In 1809, and for many years afterwards, we had no statute fixing or defining priorities for the sale of personal property, and no such prohibition as that found in the Georgia statute. The statement of the two cases proves their dissimilitude.

All that class of cases cited in the opinion in Wyatt v. Rambo, in which private property was sought to be condemned for public use, such as road cases, cases of bastardy, and, I may add, cases of summary jurisdiction in contests *inter partes*—such as those collected in Conolly v.

Ala. and Tenn. R. R. R. Co., 29 Ala. 373—rest on an entirely different principle. I think the case of Watt v. Rambo derives no support from cases within either of those classes.

In the following cases, to which many others might be added, very liberal intendments were indulged in support of the action of the orphans' court. In some of these cases, the subject was real estate, over which the administrator had no power, save that conferred by statute. Even in the cases coming within this latter class, I think this court has entertained more liberal intendments than my brothers did in the case of Wyatt v. Rambo.—See Steele v. Knox, *supra ;* Miller v. Jones, 26 Ala. R. 259 ; Herbert v. Hanrick, 16 Ala. 590–1 ; Swink v. Snodgrass, 17 Ala. 656 ; Eslava v. Elliott, 5 Ala. 266 ; Gaines v. Harvin, 19 Ala. 491 ; Cox v. Davis, 17 Ala. 714. See, also, McPherson v. Cunliff, 11 Serg. & R. 422, 429–30.

Another argument : Under the operation of section 21 of the act of 1803, *supra*, when the act of 1809 became a law, in one class of cases the chief-justice of the orphans' court exercised the most important functions of the administration, and was "liable in law as other administrators." In cases of this class, it was made his duty to pay debts. This statute, then, created a very intimate relationship between the two offices—the orphans' court and the administrator. Suppose, in such case, the chief-justice had granted an order of sale, and under the act of 1803 had made sale for the payment of debts. Would it be necessary to the validity of such sale that the order should recite that he had *made application* to himself before obtaining the order ? If not, can that be a correct construction, which requires the recital in one case, and dispenses with it in another ?

I have but a single remark to add to this branch of the case. The act of 1809 had been of force for near fifty years. So far as my observation and information extend, the understanding and practice of the courts of the country, and of the legal profession, were variant from the conclusions attained in Wyatt v. Rambo. This is said to

afford one of the lights by which to construe a statute. Gardner v. Collins, 2 Peters, 85.

I have now done with the case of Wyatt v. Rambo. I think the sale should have been upheld, even if the question had and could have come up directly on appeal. I may add, that I come to this conclusion, irrespective of the inquiry whether the orphans' court was one of general or limited jurisdiction.—See King v. Kent, 29 Ala., and authorities cited.

The provisions of the Code are substantially different from the law as it existed before. It contains no express prohibition against private sales by executors or administrators; while it does direct, in all cases, unless there be a will conferring the power, that there shall be an application by the executor or administrator, *verified by affidavit*. Its language is:

"§ 1743. Any part of the personal property of the decedent may be sold for the payment of debts, on the order of the court, on the application of the executor or administrator, unless power is conferred by the will to sell such property for that purpose."

"§ 1744. Such application must, in all cases, be verified by affidavit; and if the application is to sell slaves, notice thereof must be given, by advertisement in some paper published in the county, for three successive weeks; or, if there is no paper published in the county, by notice posted at the court-house door, three weeks before such application is heard.

"§ 1745. Any person interested may appear and contest such application, and show that no sale is required, or that it is more for the interest of the estate that other personal or real property should be sold."

By an act approved February 7, 1854, (Pamphlet Acts, 55,) section 1744 was modified as to the *manner* of giving notice.

Under these sections, I think no delay was contemplated in granting an order to sell personal property, unless it be slave property. A delay and publication for three weeks are required before obtaining an order to sell slaves.

45

I agree with the majority of the court in this case, in holding that the administrator's right to sell property at private sale is necessarily taken away by implication; and that by the same implication, an order of sale is necessary to a valid sale. I hold, also, that when an order is granted to sell personal property other than slaves, the case comes under the rule laid down above under the act of 1809. The granting of the order is the ascertainment of the jurisdictional fact, and affirms by implication that the application had been made, and the necessity for a sale ascertained. Such an order, if it could be the subject of an appeal, I would not reverse.

When, however, the order is to sell slaves, a different rule applies. If such order were brought before me on appeal, and were merely an order of sale, without recitals of application and notice, I would reverse it. Whether I would hold it void when presented collaterally, depends on another question, namely: Is the orphans' court, or probate court—for I think both stand on the same principle—as to this subject, a court of general or limited jurisdiction? I am aware that this court has frequently asserted the latter to be the case. In favor of this assertion, no satisfactory authorities have been cited, and I think it cannot be supported by argument.

The constitution of this State (Art. V, § 9) declares, that "The general assembly shall have power to establish, in each county within this State, a court of probate, for the granting of letters testamentary and of administration, and for orphans' business." I think no particular charm attaches to the name, *court of probate ;* but that the meaning of the language is, a court for granting letters testamentary and of administration, and for orphans' business. I hold, that our former orphans' court, and our present probate court, each comes within the grant of power conferred by the section of the constitution above copied.

In the opinion of the majority of the court, it is conceded that the probate court is a court of general jurisdiction, as to its power to grant letters testamentary, and of administration. The jurisdiction over these subjects,

according to the theory of that opinion, is derived from the constitution. I do not doubt that all courts filling the place occupied by our courts of probate, are, as to the matter of granting letters testamentary and of administration, clothed with the attributes of a general jurisdiction. When the grant of such letters is made, no recitals of jurisdictional facts are necessary. The letters themselves are *prima-facie* evidence of the death of the person whose estate is sought to be administered, that the particular court had jurisdiction to make the necessary orders of appointment, and that the person therein designated has been properly appointed to the trust. In Sims v. Boynton, at the last term, we considered this question, and ruled in substance as above stated.—See that case, and the authorities therein cited; also, Douglas v. Cooper, 3 Myl. & K. 378; 1 Jar. on Wills, 22, notes D, and 1, 2; 2 Greenl. Ev. § 672; and authorities collected as to the effect of probate in Thrasher v. Ingram, at the present term.

This being the rule in reference to the initiatory step—the very commencement of the administration—are there not stronger reasons for its application to the subsequent stages? Is this not eminently the case, when it is borne in mind that the court which appoints the administrator is the only orphans' or probate court which has any right to control his movements, or bring him to a settlement? See Seymour v. Seymour, 4 Johns. Ch. 409.

The same argument which upholds the above proposition, will prove that the court of probate is a court of general jurisdiction, in matters of orphans' business. I cannot agree, as is sometimes intimated, that we must. look to England, or her jurisprudence, in determining the extent and meaning of the words, "orphans' business." No such expression is found in the English system, or in their books. The powers exercised by probate or orphans' courts, in this country, are essentially dissimilar to those exercised by the semi-hierarchy, known as the English ecclesiastical courts.

In the United States, orphans' courts and probate courts are familiar tribunals, and generally have jurisdiction in matters of deceased persons' estates. I have not

taken the pains to consult the statutes of each State; but, from a pretty reliable authority, I learn that the tribunal under consideration is called the orphans' court, in Delaware, Maryland, District of Columbia, and was so called in Alabama until some eight years ago. It is called a court of probate, or probate court, in Maine, New Hampshire, Missouri, Michigan, and probably Mississippi. It is probably called a county court in Virginia, Vermont, Connecticut, Wisconsin, and Tennessee. It has a separate and peculiar name in each of the States of New York, South Carolina, Georgia and Louisiana. I am not able to affirm positively as to its designation in the other States; but suppose the jurisdiction is, in many of them, exercised by their courts of common pleas.

No reason within my knowledge existed at the time our constitution was adopted, why the framers of that instrument should have had in contemplation the judicial system of either Delaware, Maryland, or the District of Columbia. They were familiar with our own system, which, through the whole period of our territorial existence, had been known as orphans' business. I conclude, therefore, that when the constitution speaks of "*orphans' business*," it refers to the administration of decedents' estates, called in our statutes at that time of force, "orphans' business," and cognizable before a tribunal known as the *orphans' court*. I think the language, considered in connection with the surroundings, admits of no other construction.

There is nothing in the argument, that this construction will result in the absurdity of holding statutes existing before the adoption of the constitution to be the definers of the general jurisdiction of the probate court, and denying the same effect to subsequent statutes. That is not the sense in which I understand the language. It does not refer to the specific powers and duties of executors and administrators, as then defined by statute, but *to the administration of deceased persons' estates*, at that time within the jurisdiction of the orphans' court. Any subsequent legislation, within the purview of that general subject, would be as much within the intention of the framers of the constitution, as the past legislation was. To illus-

Ikelheimer v. Chapman's Adm'rs.

trate: By the constitution, (Art. V, § 8,) the general assembly were empowered "to establish a court or courts of chancery, with original and appellate equity jurisdiction." Suppose the legislature had subsequently created new heads of equity jurisdiction, as in some cases they have done; can it be contended that, as to the powers which the courts of chancery exercised at the time the constitution was adopted, it is a court of general jurisdiction, but as to its powers afterwards conferred, it is a court of limited and statutory jurisdiction?

The same illustration may be predicated on the clause which provides for circuit courts. A more pointed illustration, however, may be drawn from that clause in the constitution of the United States, which empowers congress "to establish uniform laws on the subject of bankruptcies throughout the United States." At the time the federal constitution was adopted, the English bankrupt law was a well-defined system, with numerous details. That system was evidently had in contemplation by the framers of the American constitution. Suppose congress should enact a bankrupt law, and, as they have heretofore done, engraft upon it provisions or details unknown to the English system when our constitution was adopted. Would such provisions or details be unconstitutional? Certainly not. It was a bankrupt law, as a measure of relief to insolvent traders, which the framers of the constitution had in view, and not the details of the English bankrupt law.

As I understand my brother Walker's opinion, he takes a distinction between the constitutional grant of power, "for the granting of letters testamentary and of administration," and that which relates to the sale of personal property by order of the orphans' court. He thinks the constitution itself confers the one, and that the other is dependent on statute.

My argument *supra,* on the derivation and meaning of the phrase, "*orphans' business,*" shows to some extent my opinion on this subject. To this I may add, that the *granting of letters testamentary and of administration* were powers conferred in England and every where else by

statute, and were unknown to the common law. They, as I conceive, stand alike, and are all referrible for their exposition, to our previous territorial statutes on the subject.

But, if the opinion of Judge Walker be correct, it cannot help him, or reconcile his views with our former decisions. The constitution confers on the legislature power to establish "courts of probate *for* the granting of letters testamentary and of administration." It (the constitution) does not expressly confer power on that court *for* taking the probate of wills. This is conferred by statute. Now, under the distinction taken by Judge Walker, it will necessarily follow, to keep up harmony, that probate of a will will be declared void, if it do not recite the jurisdictional facts. This we do not and would not hold; and as we have shown *supra*, and in Thrasher v. Ingram, at the present term, the rule is almost or quite universal the other way.

Having come to the conclusion, that our former orphans' court and present probate court are, "for the granting of letters testamentary and of administration, and for orphans' business," courts of general jurisdiction, the question may be asked, is their jurisdiction over the sale of lands for the payment of debts, &c., alike general? The act of 1803, and the act of 1818, both conferred on the orphans' court power to order the sale of lands ; and both these statutes were passed before our constitution was adopted.

I do not, in this opinion, propose to answer this question. There are wide differences, however, between the two questions. I point out only the following :

The appointment of an executor or administrator confers on him *the title* to the personalty ; and when he makes sale of it, he divests no third party of his title. Lands, in the absence of a testamentary direction, descend to the heir, and he alone has the title. The authority of the executor or administrator is a mere power ; and when, in a proper case, he obtains an order of sale, and sells the lands, he divests the heir of his title, and vests it in a third person. These cases, on their very threshold, present a

contest between rival interests; and there always is, or should be, an issue of fact formed and tried. It is a rule of law, almost or quite universal, that no person having a title to property shall be deprived of that title without due process of law.

The probate court being, in my opinion, a court of general jurisdiction as to the administration of the personalty; and the validity of this sale coming up collaterally, I think the sale made by the administrator in chief should be upheld. My opinions on this question were very fully presented in the case of Hunt's Heirs v. Jude and others, at the last term, and need not be here repeated. I am in favor of a reversal in this case.