# The State, *ex rel.* Attorney General *v.* Buckley.

## Impeachment.

54    599
126   443

54    599
139   642

54    599
140   183·
54·   599
141   142
141   151

1. *Constitution, Art. IV, sections* 19, 20, 21, 22 ; *objects of.*—The controlling aim and purpose of sections 19, 20, 21,22 of article iv of the Constitution of 1875, were to fasten individual accountability on the several members of the legislature, by requiring their action or non action to appear on the journals; to prevent "hodge podge" and injurious combinations, by confining each law to one subject; and to prevent hasty and inconsiderate legislation, surprise and fraud, by requiring bills to be read on three several days in each house, referred to a committee of each house, and returned therefrom.

2. *Same; intendments indulged.*—No intendments can be indulged that the constitutional requirement as to the taking of the yeas and nays in the passage of bills, has been complied with; this must affirmatively appear from the journals, which in this respect import absolute verity, and if they are silent, no other evidence can be received, and the act has no constitutional existence. It will be presumed, however, that the other requirements of sections 19, 20, 21, 22 of article iv of the Constitution have been complied with, unless the contrary be shown.

3. *Amendment of bills; effect of.*—So long as the original purpose of the bill is not changed, the committee to whom it is referred may report it back with amendments or report a substitute; and the substitute will take the place of the bill referred, and is not remitted to the status of a new bill, introduced for the first time.

4. *"Final passage" of bill; what is meant by.*—The final passage of a bill, within the meaning of section 21, article iv of the Constitution, is the vote on its passage, in either house of the general assembly, after it has received three readings, on three different days in that house.

5. *Impeachment law; to what objection not liable.*—The "act to provide for the impeachment and removal from office of the officers mentioned in section 2, and section 3 of article vii of the Constitution of Alabama," does not contain more than one subject, and in its enactment none of the provisions of sections 19, 20, 21 and 22, article iv of the Constitution were violated.

6. *Impeachments.*—After the adoption of the Constitution of 1875, impeachment, save as therein provided for, ceased to be a part of our jurisprudence.

7. *Same.*—As to the officers mentioned in section 1, article 7, relating to impeachments, the Constitution is complete and self executing.

8. *Same.*—As to officers mentioned in sections two and three of article 7, the Constitution was not self executing, and until legislative action prescribing

[The State, ex rel. Attorney General v. Buckley.]

the regulations under which impeachment proceedings against them could be instituted, these provisions of the Constitution remained inert, and there was no tribunal authorized to try such officers.

9. *Same.*—Impeachment under our Constitution is a criminal prosecution ; but not one in which the accused has a constitutional right to a jury trial, and it is no objection to a law providing for impeachments under section 2 of article 7 of the Constitution, that provision is not made for a jury trial.

10. *Same; right of accused to be confronted by witnesses.*—In all criminal prosecutions, impeachments as well as others, the accused has a constitutional right to be "confronted by the witnesses against him," and provisions of an impeachment law, requiring the taking of testimony by examiners, not in the presence of the court, violate this constitutional right of the accused; and the only part of the law upon the subject, being unconstitutional, this court is left without "regulations prescribed by law," as to the manner of taking testimony, and can not by its own rule or orders as to the calling and hearing of witnesses, provide other regulations to cover the defect.

This was an information, filed in the supreme court, by the attorney general against Charles W. Buckley, judge of the probate court of Montgomery county, praying his impeachment and removal from office, under the provisions of "an act to provide for the impeachment and removal from office of the officers mentioned in section 2 and section 3 of article vii of the Constitution of Alabama," approved March 7th, 1876.

On the 30th day of March, 1876, two attorneys of the court presented the affidavits of six persons, charging the defendant with corruption in office and with certain official malfeasances, (the substance of which is stated in the information,) and thereon moved the court for an order that the attorney general "institute proceedings and prosecute the same against" the defendant, under the provisions of the above recited act.

The court being of opinion, from an inspection of the affidavits, that there was probable cause to believe the defendant "has been guilty of offenses in office, subjecting him to impeachment under sections one and two of article vii of the Constitution of this State," ordered that the affidavits be filed and that the attorney general, in the name of the State of Alabama, institute proceedings against said Charles W. Buckley, in conformity to the statute," approved March 7th, 1876, and that "the attorney general shall file the information hereby ordered with the clerk of the court, on or before the 10th day of April next."

The attorney general, in pursuance of this order, filed an information with the clerk of the court on the 7th day of April, 1876, and thereupon the court made an order, that Buckley appear before the court, on the 4th day of May following, at the supreme court room, and answer the information, and that "the clerk issue a summons, setting forth a copy of the order, directed to "any sheriff of the State of

Alabama," commanding him to summon said Charles W. Buckley to be and appear before this court, at the time and place aforesaid, and due return of said summons make to this court, and to execute the same by delivery of a copy thereof, and a copy of said information, made and certified by the clerk of this court, to said Charles W. Buckley, at least twenty days before said fourth day of May, 1876." Buckley was duly served with notice in pursuance of this order on the 8th day of April, 1876.

The information contained several counts; but it is unnecessary to set them out at length, in the view which the court took of the case. After showing Buckley's election as judge of the probate court of Montgomery county on the 3d day of November, 1874, and his qualification and entering upon the discharge of his duties, continuing up to the time of the filing of the information, it charged, 1st. that he unlawfully purchased and dealt in county claims; 2d. that in pursuance of a combination and conspiracy with one Barber, and others unknown, Buckley corruptly and with intent to defraud the county, procured a contract for Barber for the support of the poor, when he was not the lowest bidder, and drew certain warrants on the county in his favor in pursuance of the conspiracy, with the intent to defraud the county; 3d. that he appointed one Kennedy *guardian ad litem* in certain cases in the probate court, with the corrupt understanding and agreement that he was to divide the fees with him, and did in a certain specified cases, in which he taxed up fees in favor of such guardian *ad litem*, corruptly receive such fee, in pursuance of such understanding.

The time when these various acts were committed, is not specified otherwise than in the general charges that they were done "before the filing of the information," except as to the charge as to the corrupt conspiracy with Barber. As to that the information charges that Buckley corruptly procured the commissioners' court "to award said Barber a contract for the support of the paupers of Montgomery county, during the year beginning on the 2d day of March, 1875."

Buckley appeared, and assigned numerous grounds of demurrer to the complaint as a whole, and to the several counts. The chief grounds upon which the information was assailed, resolve themselves into these:

1st. The act was never constitutionally passed; it was not read on three several days, as required by the Constitution, nor were the ayes and nays taken and recorded on its final passage; after the original bill was introduced it was referred to the judiciary committee of the house, and so altered or amended on its attempted passage through the senate and

house of representatives, as to change its original purpose; on the passage of the bill it was amended in the senate, and the house refusing to concur in the amendments and the senate to recede therefrom, a conference committee was raised, and the report of the conference committee was adopted, after which there was no further legislative action than the enrollment of the bill.*

2d. The act contained more than one subject, both of which were set forth in its title.

3d. The act does not give the accused the right to be confronted by the witnesses against him.

4th. The bill was not read at length on its final passage.

5th. That the act denied the accused his constitutional right of trial by jury.

6th. That the act was *ex post facto*, and increases the penalty attached by law at the time of the commission of the offenses charged.

7th. That the information filed has never been approved by the finding of a grand jury.

8th. That the court had no jurisdiction of the case made by the information, which could be heard only by the circuit court.

The court sustained the demurrer and quashed the proceedings.

SAMUEL F. RICE, and WALTER L. BRAGG, for defendant, argued as follows in support of the demurrer:

1. Before a statute can acquire the force of law it must go through all the forms required by the Constitution, and if necessary, courts will look behind the statute to the legislative records to see whether it has a legal existence.—43 Ala. 721; 48 Ala. 121; 13 Michigan, 492; 5 Ohio, 363. The journal of each house is a public record.—13 Michigan, 493; 5 Ohio, 363; Constitution of Alabama, Article IV, section 21. Bills, amendments, substitutes and reports of committees are also public records.—Revised Code of Ala. sections 44–47.

2. The legislative history of the passage of this act, in brief, is that the original bill was introduced in the house of representatives and read once and the first time on the 24th of January, 1876.—House Journal, p. 227.

It was read the second time and referred to the judiciary committee January 25th, 1876.—H. J., p. 238.

On the 7th of February following the judiciary committee reported a new bill with a different title, as a substitute for the original bill. This new bill was read once and the first

---

* The brief of defendant's counsel accurately sets forth what the journals show as to the passage of the law under discussion.

time on that day, and the report of the committee offering it as a substitute was adopted.—H. J., p. 381.

This was the only time this substitute was ever read in the house. It was then treated as passed by the house, and was sent to the senate on the 8th of February, 1876.—Senate Journal, p. 337.

Not only were the titles of the original bill and the sub-stitute different, but in many other respects they had provisions differing in substance as well as form. A few of these we will enumerate. The original bill had sixteen sections; the substitute twenty-four sections. The original provided for the impeachment and removal of all the officers of the State, county and municipal; the substitute does not provide for the impeachment and removal from office of the officers mentioned in section 1 of Article VII of the Constitution. The original provides for trial by jury in all original as distinguished from appellate proceedings before the courts; the substitute provides for no jury in an original proceeding commenced in the supreme court. The original was in no sense retrospective; the substitute is retrospective and does provide for the punishment of offenses committed prior to the passage of the act. The original requires jurors to be summoned specially and with peculiar qualifications, to try cases as well in the circuit, city and criminal courts as in the supreme court; the substitute provides for nothing of the kind. The substitute provides for a final record in each case; the original does not. The substitute clothes the examiner with power to fine and imprison for contempts; the original did not. The substitute provides that the attorney general shall file an information when directed by the governor, or upon the finding of a grand jury; the original did neither of these. The substitute provides that a circuit solicitor shall file an information upon the complaint of a grand jury; the original does not. The original has a section which repeals all laws and parts of laws inconsistent with any of its provisions; the substitute has no such provision. Other differences between the original and substitute might be enumerated, but these are sufficient to show that the substitute was a new bill.—See Cushing's Law & Practice of Legislative Assemblies, section 2203.

After the substitute passed the house with only one reading, as above stated, and was sent to the senate, it was read the first time in this latter body February 11th, 1876.—Senate Journal, p. 354.

It received a second reading in the senate February 14th, 1876, and was referred to the judiciary committee.—p. 373.

On the 15th of February, 1876, the senate judiciary com-

mittee reported a substitute for this bill.—S. J., pp. 388, 399. Several amendments were made to the senate substitute, and then the senate substitute and the amendments were laid on the table, February 16, 1876.—S. J., p. 398.   The house bill was taken from the table in the senate on the 19th of February, 1876, and made a special order.—S. J., p. 433.   On motion, the house bill was amended on the 21st of February, 1876, by striking out section 12 and inserting in lieu thereof section 12 as it now stands in the enrolled bill, and also brief amendments of sections 16 and 18.—S. J., pp. 433, 434.   On the 21st of February, 1876, the house bill as amended, was read the third time in the senate and passed.—S. J., pp. 450, 451.   On the 23d day of February, 1876, the house refused to concur in the senate amendments.—S. J., p. 471.   On the 1st of March, 1876, the senate adhered to its amendments and raised a committee of conference.—S. J., p. 538.   On the 3d of March the senate notified the house of a committee of conference having been appointed.—S. J., p. 555.   On the 4th of March the senate was notified that the house had adopted the report of the conference committee.—S. J., p. 563. On the 6th of March the senate concurred in the report of the conference committee.—S. J., pp. 579, 580.   On the 7th of March, 1876, the president of the senate signed the bill in the presence of the senate.—S. J., p. 603.   The house journal shows, also, the following additional facts :   On the 22d of February, 1876, the house concurred in the senate amendments to the bill.—H. J., p. 589.   On the 23d of February, 1876, the house reconsidered and refused to concur in the senate amendments to the bill.—H. J., p. 562.   On the 1st of March, 1876, the senate refused to recede, and asked for a committee of conference.—H. J., p. 674.   Committee of conference appointed in the house March 3, 1876. H. J., p. 712.   Report of committee of conference adopted in the house March 4, 1876.—H. J., p. 748.   Senate agrees to report of conference committee March 6, 1876.—H. J., p. 775.   The bill was enrolled and signed in the house March 7, 1876.—H. J., p. 820.   The bill was approved by the governor March 7, 1876.—H. J., p. 827.

3.   No fact can be more clear and indisputable than as shown by their journals, that the bill which passed both houses of the general assembly never did receive three readings in each house on different days while on its passage, nor was it read at length on its final passage in either house. The 21st section of Article IV of the Constitution of Alabama provides that "no bill can become a law unless, on its *final passage*, it be read at length, and the vote be taken by

yeas and nays, the names of the members voting for and
against the same be entered on the journals."

This is no parliamentary rule. It is a constitutional re-
quisite. It is mandatory.—41 Ala. p. 20; 43 Ala. p. 721;
Cushing's Law and Practice of Legislative Assemblies, sec-
tion 2203.

To make it a law it was necessary for the substitute orig-
inated by the house judiciary committee, to have had three
readings in the house on different days, in the same manner
as if it had been a new bill introduced by a member. It was
a new bill. The fact that it was originated by a committee
instead of a member made no difference. The authority
cited in Cushing's Law and Practice of Legislative Assem-
blies, section 2203, is direct and positive on this point, and
nothing in conflict with it can be found in the books. But
in addition to this, the section of the constitution requires
that on the "final passage" of the "bill" it shall be "read
at length" and the vote taken by yeas and nays. This re-
quirement of the constitution was disregarded. A bill is
one thing; an amendment another; a conference report
something still different; and a bill *as amended* on its "final
passage" is yet another thing, peculiar in itself. Only *a bill*
can have a "final passage." A third reading is not necessa-
rily the "final passage" of a bill. Instances may be readily
conceived in which a bill may have three readings in either
house on as many different days and still not be on its "final
passage." Either house may, if it sees proper, in maturing
a bill, read that bill on twenty different days should the
house so determine before putting the bill upon its "final
passage." According to the Constitution, there shall not be
less than three readings of a bill in each house, but the Con-
stitution does not undertake to say that there may not be
more than that. A vote may not be reached on the "final
passage" of a bill until it has had forty readings, but still
this must occur before it can become a law, though a hun-
dred amendments have been previously concurred in, and
reports of conference committees may have been adopted.
If the framers of the Constitution had intended that the
adoption of the report of a conference committee should
stand in lieu of reading the bill at length upon its "final
passage," nothing would have been more easy than for them
to have so declared; but they have done nothing of the kind.
On the contrary, they have expressly negatived any such idea
by affirmatively declaring that when the bill is on its "final
passage" it must be read at length, and voted on accordingly.
The "final passage" of a bill is *the last vote that is taken upon
that bill as an entirety in either house;* and whether the words

"final passage" are construed in their popular signification or technical meaning, the result is the same. The final vote in each house was taken upon the "report" of the conference committee.

A conference committee has no power to do any thing except to settle "the disagreement" between the two houses. After adopting the "report" of the conference committee, it was still necessary to put the bill upon its "final passage," and this could only be done by reading it at length and voting upon the bill *as amended.*—Cushing's Law and Practice of Legislative Assemblies, sections 2269, 2275; Constitution of Alabama, Article IV, sections 19, 21, 22. The language of section 19 of Article IV of the Constitution is, "*No law shall be passed except by bill.*"

4. The act contains two subjects; one is impeachment, the other is removal from office. The distinction between these two things was recognized by the common law of England, and has been kept up ever since.—Revised Code of Alabama, sections 3082–3100; Bouvier's Law Dict. (14th Ed.), Tit. Impeachment; Tit. Removal from Office; Constitutions of Alabama, 1819, 1865, 1868, 1875; 7 Bacon's Ab. Tit. Office and Forfeiture of Office.

Impeachment has always been a trial before a legislative body; a proceeding for removal from office, a trial before the courts of law; the first for offenses, in the main, not enumerated or defined by law; the last for no other offenses except such as are defined by law.

5. The act is penal and fails to provide, with sufficient certainty, the extent and duration of the punishment that must follow in cases of conviction. This was one of the main grounds upon which the United States supreme court recently held the enforcement act unconstitutional in the case of the Grant Parrish Prisoners (*U. S. v. Cruikshank*). That this is a highly penal law—See *Ex parte Diggs*, 52 Ala. 381; *Cummings v. Missouri*, 4 Wallace, 320–323; *Ex parte Garland*, 4 Wallace, 333.

6. It is also an *ex post facto* law. It provides for the punishment of crimes committed before it was enacted; and provides a different punishment from that which was prescribed by the laws in force at the time the crimes were committed. The present Constitution of Alabama repealed the Constitution of 1868 in relation to impeachment, and all laws "inconsistent" with it. But legislation was necessary under the new Constitution before the power of impeachment could be exercised by the courts. There is a chasm in the law between the 6th day of December, 1875, when the present Constitution went into effect, and the 7th of March, 1876, and during

[The State, ex rel. Attorney General v. Buckley.]

this period there could be no punishment by impeachment inflicted by the courts, because there is no saving clause in the schedule to the new Constitution as to impeachable offenses. Yet this act attempts to go back behind that chasm and prescribe a punishment for crimes then committed, " and which in point of fact at the time of its enactment were not punishable at all."—*Jordan v. The State*, 15 Ala. 748; *Aaron v. The State*, 40 Ala. 309; Schedule present Constitution of Alabama. Is this the punishment of an offense, and " legally applied," as provided for in the 8th section of the bill of rights ?—Section 23, Bill of Rights ; 4 Wallace, 320; 4 Wallace, 333; section 8, Bill of Rights.

7. This act does not extend to the defendant the right of trial by jury. The rule is that in all cases, civil and criminal, to which a party was entitled to the right of trial by jury at the time of the adoption of the Constitution, the right is preserved inviolate, and cannot be taken away by the legislature in providing for the trial of such cases by statutes enacted after the adoption of the Constitution.—17 Ala. 516-517 ; 26 Ala. 165 ; 44 Ala. 721 ; 41 Vermont, 519; section 12, Bill of Rights. In a proceeding for removal from office, the right of trial by jury existed before the adoption of the present Constitution of Alabama.—2 Ala. 143-144 ; Rev. Code of Ala. sections 3082-3085, 3091. In such a case it also existed at common law.—7 Bacon's Abridg. Tit. Office M. & N, and authorities cited ; 5 Bacon's Abridg. Tit. Juries D.; authorities in notes to case of *People v. Richardson*, 4 Cowen, p. 120 ; 3 Blackstone's Comm. (Sharswood's Ed.) p. 380.

Why should this act fail to provide the right of trial by jury to " chancellors, judges of the circuit courts, solicitors of the circuits, and judges of inferior courts from which an appeal may be taken directly to the supreme court," and yet concede that right to all county officers, and even to the mayor and intendants of cities and towns ? The Constitution does not authorize anything of the kind. It is in violation of the plain spirit of the Constitution. .

The right of trial by jury, in the language of Blackstone, is " the most transcendent privilege which any subject can enjoy," and the same author calls it the people's share in the administration of public justice. *It is within the power of this court to have a jury whether the legislature has provided for one or not.* In the exercise of its original jurisdiction, the court of King's Bench, in England, has jury trials in all cases to which jury trials are applicable. The same is true of the supreme courts of many of the States of the American Union. Our people love it, and they ought to love it. It is one of the grand fundamental rights of man in every country where

[The State, ex rel. Attorney General v. Buckley.]

constitutional liberty prevails, and no fair or satisfactory substitute for it has ever been found in the trial of criminal cases.

8.   Impeachment is a criminal procedure.—6 American Law Register, pp. 260-263; 2 Story on Constitution, p. 576, note and authorities; section IV, Art. II, Constitution U. S.; Earl of Middlesex's case, 1 Hallam Const. History, p. 364.

Being a criminal proceeding, the accused is entitled " to be confronted by the witnesses against him;" yet this act provides for the taking of their *depositions without his consent.* To further show that it is a criminal proceeding, we ask, *could the accused be compelled to testify against himself in this case?*   In no impeachment trial, since such trials have had the semblance of law, was such a thing ever attempted.   It was done in some of the earliest star chamber trials.—See 7th section Bill of Rights; *Dominguez v. The State,* 7 Smedes & Marshall, p. 477.

This feature also makes this act *ex post facto.*—*Cummings v. Missouri,* 4 Wallace, 325-326.   At the time Buckley is alleged to have committed these offenses, the Constitution of 1868 was in force, and the *depositions of witnesses, taken without his consent,* could no more have been used against him, on his trial for impeachment, in the senate of Alabama, than could an equal number of Colt's repeaters have been used against him on such trial.   The act is a penal law, and does not provide when it shall go into effect.   By existing laws, it did not go into effect *until thirty days after the general assembly adjourned.*—Rev. Code of Ala. Sec. 3544.

This court will take judicial notice, that the general assembly adjourned on the 8th of March, 1876, and this information shows, on its face, that it was filed on the 6th day of April, 1876, *a period of less than thirty days after the general assembly adjourned, and when the statute had not gone into effect.*

JOHN W. A. SANFORD, Attorney General, and D. S. TROY, DAVID CLOPTON, and GEO. F. MOORE, for the State.—1.   At common law, upon an offense committed by an officer, which amounts to a forfeiture, an information may be exhibited against him.—2 Leving, 71.

And if the defendant be convicted, on confession or verdict, the office was seized into the hands of the king without a *sci. fa.,* or other process against him.—Com. Dig. Officer, (K) 13.

An impeachment lies if an officer neglects or abuses his authority.—Com. Dig. Information, (B), citing Parliament, Impeachment L. 12.

[The State, ex rel. Attorney General v. Buckley.]

This proceeding, by information, is expressly retained by the Constitution of 1868.—Declaralation of Rights, section 10. And also in the Constitution of 1865.—Declaration of Rights, section 9. Also, in the Constitution of 1819.—See Declaration of Rights, section 12. And the Revised Code provided the mode of proceeding.—See sections 3082, 3083, *et seq.*

The existence of this common law jurisdiction is recognized in *The State v. Moore & Ligon*, 19 Ala. 514.

2. Article VII of the Constitution does not cover the whole ground of impeachable offenses, so as to supersede and exclude all the provisions of the common and statutory law *variant* merely from its provisions. On the contrary, there are many provisions of the statutory and common law on the subject of impeachable offenses, not covered by that article, and not inconsistent with it, which remain in full force.

The only changes made by the article are—1. It limits impeachment and removal from office to the causes specified in section 1. 2. It limits the punishment. 3. It confers jurisdiction on the supreme court, under such regulations as may be prescribed by law of offenses committed by certain officers named in section 2.

3. The common law was established in Alabama, and promulgated long before the adoption of the present Constitution, defining and determining what were impeachable offenses, and it was not impaired, or its force diminished, by the adoption of the present Constitution, and it can be legally applied, when the offender is brought before a tribunal legally constituted, with jurisdiction to hear and determine what was an offense at common law.—*Cawood v. State*, 2 Stew. 264; *Barlow v. Lambert*, 28 Ala. 706; 6 Ala. 637; 19 Ala. 829. Hence, if the laws declaring the offense and its punishment remain in force, the suspension of the tribunal, or the establishment of new tribunals for its enforcement against an offender, violates no constitutional right.— Cooley Con. Lim. 272; *Perry v. Commonwealth*, 3 Grattan, 632; *Halston v. Commonwealth*, 16 B. Monroe, 15; *State v. Ryan*, 13 Minnesota, 357; *Gist v. State*, 9 Wallace, 35; 37 Penn. State R., and cases there cited; Smith on Constitution, 374; 11 Pick. 32.

The schedule to the Constitution, section 1, expressly declares that "all laws in force at the ratification of the Constitution, and not inconsistent therewith, shall remain in full force." Hence, we insist that the proposition is erroneous, that "between the adoption of the Constitution and 7th March, 1876, there was no law in this State providing for the

impeachment of the officers enumerated in sections 2 and 3, article VII, of the Constitution." It should have been stated that there was no tribunal established for their trial and punishment. The Constitution itself declares what are impeachable offenses, what the punishment shall be, and the tribunal before which they shall be tried. The only power reserved to the legislature over the subject, was to regulate the mode of trial. There was no "cessation of the law" declaring the offense and punishment. In *Bent v. State*, and other cases cited in support of the proposition, it was the "cessation of the law" which declared the act to be criminal, or which fixed or determined its punishment, which discharged the offender. Every charge against the accused is for an offense for which he was liable to impeachment under the laws in force prior to the adoption of the present Constitution, and which laws are still in force. The change or suspension of the tribunal did not release him. In *Harlan v. State*, 41 Miss., the court say: "The laws themselves are not suspended during the administration of Gen. Canby and Provisional Governor Sharkey, but only their administration was temporarily obstructed. . . . . On the restoration of the proper functionaries, offenders may be held to a due accountability." In *Phillips v. Commonwealth*, 19 Grattan, 527, the court say: "We cannot well conceive of an accused having such a right to a particular mode of trial as to make a legislative change thereof. an *ex post facto* law, and, therefore, unconstitutional; the mere statement of such a pretension is sufficient to refuse it." See, also, Bishop's Statutory Crimes, section 180; 1 Bish. Crim. Law, section 280. But it does not appear from the information that any of the offenses charged were committed before the passage of the act of March 7th, 1876, and the question whether the act was *ex post facto* in its operation, or not, does not arise on demurrer.

II. We insist that the defendant misconstrues sections 6, 7 and 8 of the act of March 7th. They do not deprive the defendant of his constitutional right to be confronted with the witnesses against him. But if they are unconstitutional and void, the court has the power, inherent in every tribunal established by law, to hear and determine causes, to summon and swear witnesses, and hear their evidence.—1 Green. Ev. section 300; Pattus Dwarris on Statutes, p. 340.

The right of the defendant to be confronted with the witnesses against him, was established in England by a statute which was passed in the reign of Phillip and Mary. It is this right which has been preserved in the Constitution of this State. When, where and how he is to be confronted

with the witnesses against him, is left to the common or statutory law, and the defendant has no constitutional right to be confronted with them before the tribunal where he is tried. Hence, it has been uniformly held in England and in this country, that depositions taken on a coronor's inquest, or a preliminary examination where the defendant was present, confronted with the witnesses and had the opportunity to cross examine, could be read in evidence on the final trial if the witnesses were dead or insane.—Cooley on Const. Lim. 318; *Tharp v. State*, 15 Ala. 749; *Dupree v. State*, 33 Ala. 380; *Davis v. State*, 17 Ala. 354; *State v. Palsen*, 29 Iowa, 133; *Commonwealth v. Richards*, 18 Pick. 437; *Queen v. Russell*, 6 Cox. C. C. and 11 Ib. 134; Fisher's Dig. Crim. Law, 550.

But if we are wrong in both the foregoing propositions, there is nothing in the statute which prevents the court from requiring the examiners to take the evidence in its presence, and these statutes should receive such reasonable construction, if possible, as will give them a field of operations not in conflict with the Constitution.—Cooley on Con. Lim. pp. 184, 185, *et seq.; Daw v. Norris*, 4 N. H. 17; *Newland v. Marsh*, 19 Ill. 384; *People v. Supervisors of Orange*, 17 N. Y. 241; *Sadler v. Langham*, 34 Ala. 311; *Huffman v. State*, 29 Ala. 40; *Ex parte Pollard*, 40 Ala. 91.

The statutes of the State are silent as to the mode of examining witnesses in criminal cases, and the failure to provide such mode in impeachment cases, certainly car not defeat the jurisdiction conferred on the supreme court by article 7 of the Constitution, to hear and determine impeachments.

It was a grave public necessity which induced the people of Alabama, in convention assembled, to confer on the supreme court jurisdiction of impeachments of *nisi prius* judges, and the legislative act to give effect to this fiat of the people, if construed by the rules declared in *Huffman v. State*, 29 Ala., can not be declared to be an abortion. If so, and if as urged in this case, a law which provides a tribunal for the punishment of offenses committed before its passage, is *ex post facto*, then these officers have an absolute immunity from impeachment and removal from office for all offenses committed in the past and for an indefinite time in the future, and a probate judge may be convicted of felony in accepting a bribe and be sent to the penitentiary, and still hold his office.

A construction of the Constitution which leads to this result can not accord with the principles which should govern us in construing such instruments. In *Dorman v. State*, 34 Ala. 216, the court say: "A constitution is not to receive a technical construction, like a common law instrument or a stat-

ute ; it is to be interpreted to carry out the great principle of government, not to defeat them." See, to same effect, Cooley on Con. Lim. p. 83, [bottom p. 91] : *Henshaw v. Foster*, 9 Pick. 216.

STONE, J.—The Constitution of 1875 introduced certain new regulations to be observed by the general assembly in the enactment of laws, not theretofore known in our constitutional history. Among these new regulations are the following, found in Article IV :

Sec. 19. . . No bill shall be so altered or amended on its passage through either house as to change its original purpose.

Sec. 20. No bill shall become a law until it shall have been referred to a committee of each house, and returned therefrom.

Sec. 21. Every bill shall be read on three different days in each house, and no bill shall become a law unless on its final passage it be read at length, and the vote be taken by yeas and nays, the names of the members voting for and against the same be entered on the journals. . .

Sec. 22. No amendment to bills by one house shall be concurred in by the other, except by a vote of a majority thereof taken by yeas and nays, and the names of those voting for and against recorded on the journals, and reports of committees of conference shall in like manner be adopted in each house.

The convention of 1875, in section 2 of the same article, retained the clause found in the corresponding article and section of the Constitution of 1868, that "each law shall contain but one subject, which shall be clearly expressed in its title;" but the later Constitution contains certain exceptions to this rule, not expressed in the former one.

The foregoing clauses have for their main controlling aim and purpose—

First. To fasten an individual accountability on the several members of the legislature, by requiring the action or non-action of each to appear on the journal.

Second. To prevent 'hodge-podge' and injurious combinations, by confining each law to one subject.

Third. To prevent hasty and inconsiderate legislation, surprise and fraud, by requiring bills to be read on three several days in each house, referred to a committee of each house, and returned therefrom.

That these constitute the main objective ends of these constitutional innovations must be apparent to every one. Hence, the convention confided to the legislature no power

[The State, ex rel. Attorney General v. Buckley.]

or discretion to dispense with the constitutional rule requiring a reading in each house on three several days.

The inquiry naturally presents itself, what intendments, if any, are to be indulged for or against the constitutionality of legislative enactments? On the question of the yeas and nays required to be spread on the journal, there can be no reasonable ground for doubt. · The journal is the record which the legislature keeps, and is required to keep of its proceedings. Like all other records required by law to be kept, it imports verity. Taking into account the character of the body whose record it is, a co-ordinate department of the government, we hold that it imports absolute, indisputable verity. The Constitution, then, requiring that the yeas and nays shall be matter of record, no other evidence can be received of this requirement, nor can its want be supplied by intendment. Of this fact the record [journal] must speak, and if silent, the fact, in' legal contemplation, does not exist.

· The intendments, however, in reference to the other provisions of the Constitution above copied, are different. The judicial department will presume compliance with them by the legislative department, unless the contrary is shown to be the case.—Cooley Con. Lim. 139.

When a bill is referred to a committee, it is within the discretion and power of such committee to report it back with or without amendment. The amendments reported may be so numerous as to require or suggest that the committee report an amendatory or substitutional bill. If in so doing, they do not so far depart from the bill referred as to offend against the provisions of section 19, article 4 of the Constitution, such reported bill will take the place of the one referred, and will not be remitted to the status of a new bill, introduced for the first time. This is only amendment, which is always allowable at that stage of the bill.—See Cushing Law and Prac. Leg. Assemblies, § 2203. To hold otherwise would greatly impede, if not hinder, legislation.

In voting, in one house, on amendments adopted in the other, and in voting on reports of committees of conference, the yeas and nays are required to be taken, and spread on the journal. These, if they occur in the progress of the bill, the journal must affirmatively show, under the rule declared above.

What we understand as the "final passage" of a bill, under section 21, article 4 of the Constitution, is the vote on its passage in either house of the general assembly, after it has received three readings on three different days in that house.

With the exception of the above innovations in the process and course of legislation, the regulations remain sub-

(39)

stantially as they were before the adoption of the Constitution of 1875.

The objection has been urged that the act " to provide for the impeachment and removal from office of the officers mentioned in section 2 and section 3 of article 7 of the Constitution of Alabama," Sess. Acts 1875-6, p. 277, contains more subjects than one. We can not assent to this. The whole subject of the act is impeachment, its trial and punishment.

We find nothing in the enactment of the act under discussion which violates any of the constitutional provisions above set out.

Article VII of the Constitution of 1875 relates to impeachments proper. It is confined to that subject, and, in its several sections, makes provision for every official misconduct, or disqualification, which, under our system, authorizes impeachment. That supreme, and, in many respects, severe remedy, can not be invoked or applied under our system, otherwise, or to a greater extent than its provisions authorize. After the adoption of our Constitution, impeachment, save as therein provided for, ceased to be a part of our jurisprudence. To hold otherwise would force the decision, that the remedy therein provided is cumulative only, and that impeachment of all civil officers can still be prosecuted before the senate as a court of impeachment. The framers of the Constitution, while they introduced some features that were novel, intended to occupy the whole ground of impeachable offenses, and to interdict all modes of trial not therein preserved and provided for. Their language forces this construction.—See *Ikelheimer v. Chapman*, 32 Ala. 683, and authorities cited.

Under article 7, section 1 of the Constitution, it is declared that " the governor, secretary of state, auditor, treasurer, attorney general, superintendent of education and judges of the supreme court, may be removed from office . . . by the senate, sitting as a court for that purpose," &c.

Sec. 2. " The chancellors, judges of the circuit courts, judges of the probate courts, solicitors of the circuits, and judges of the inferior courts from which an appeal may be taken directly to the supreme court, may be removed from office . . by the supreme court, under such regulations as may be prescribed by law."

Sec. 3. " The sheriffs, clerks of the circuit, city or criminal courts, tax collectors, tax assessors, county treasurers, coroners, justices of the peace, notaries public, constables, and all other county officers, mayors and intendents of incorporated cities and towns in this State, may be removed from office . . by the circuit, city or criminal court of the

county in which such officers hold their office, under such regulations as may be prescribed by law ; *Provided*, That the right of trial by jury and appeal in such cases be secured."

A very marked difference is observable in the language of these three sections. The first is complete and self-executing. No legislation, in the form of regulations or otherwise, is necessary to put it into full operation. As to the officers therein named, it neither provides nor contemplates any new tribunal, or new forms of remedy or proceedings.

It is different with sections 2 and 3. They introduce a system in many respects new in our jurisprudence. While they declare a tribunal before which each officer therein named may be impeached, refer with sufficient certainty to the offenses or causes for which impeachment will lie ; and in the 4th section fix a maximum beyond which punishment shall not be extended, still they provide no machinery or mode of procedure, by which parties may be brought to trial under those sections. The "regulations" are left, to be prescribed by the legislature. Impeachment, and all incidents attending it, are so unlike prosecutions, suits and trials in courts of common law jurisdiction, whether criminal or civil, that the practice in the latter can afford no sufficient guide for a trial in the former. Consequently, no proceedings could be instituted until there was legislative action, prescribing the regulations. Till then, sections 2 and 3 of article 7 remained inert.

It results from what we have said that as to the officers enumerated in sections 2 and 3, the senate—the tribunal formerly authorized to try most of them on articles of impeachment—was disrobed of that power, and with it all machinery for the trial of such offenses ceased to exist by the adoption of the Constitution of 1875. The courts, on which that jurisdiction was thereby conferred, being without the requisite regulations for the conduct of such trials, were inert and powerless in the premises, until there should be appropriate legislation to carry those sections into effect.

In the Constitution of Mississippi, adopted in 1833, the following clause was inserted :

"The introduction of slaves into this State, as merchandise, or for sale, shall be prohibited from and after the first day of May, eighteen hundred and thirty-three," with a certain proviso, not material to the present inquiry. No statute was passed giving effect to this constitutional provision until 1837. In 1836 slaves were carried into the State of Mississippi for sale, and were sold on time, the purchaser, Brown, giving his note for the purchase money. Suit was brought on the note against Groves, one of the indorsers, in the cir-

cuit court of the United States, and the illegality of the contract, under the provisions of the Constitution above copied, was pleaded in bar. The case was carried to the supreme court of the United States, and was there argued with distinguished ability by some of the ablest counsel this country has produced. It was ruled that because the clause of the Constitution contained the words "shall be prohibited," it was inoperative until the legislature acted upon it. The court said this language was directory to the legislature, and was a command to it to do certain acts. It was further held that although the legislature of Mississippi, on the 13th of May, 1837, and before that suit was brought, enacted a law, and therein "enforced the prohibition of importation [of slaves] for sale by severe penalties," still, this contract, which was a promissory note given in 1836 for the purchase of slaves imported into that State in disregard of the Constitutional provision above, was a valid and binding contract, and a recovery was had upon it.— *Groves v. Slaughter*, 15 Pet. 449.

This principle was reaffirmed in the following later cases, all of which arose on the same provision of the Mississippi Constitution: *Rowan v. Runnels*, 5 How. 134; *Truly v. Wanzer*, Ib. 141; *Sims v. Hundley*, 6 How. 1; *Hardeman v. Harris*, 7 How. 726. The opinion in three of the four cases last cited was delivered by Chief Justice TANEY, and in the fourth one (*Truly v. Wanzer*) by Justice GRIER.

*In re Griffin*, 2 Amer. Law Times Rep. 94, the question was made before Chief Justice CHASE, whether the 3d section of the 14th article, amendments to the Constitution of the United States, was self-executing, or whether it required an act of congress to give it effect, so as to remove from office persons who came within its provisions. The language of said section is as follows:

"No person shall . . hold any office, civil or military, who having previously taken an oath as an . . executive or judicial officer of any State, to support the constitution of the United States, shall have engaged in insurrection or rebellion against the same, or given aid or comfort to the enemies thereof. But congress may, by a vote of two-thirds of each house, remove such disability."

Judge Sheffey, a judge of a circuit court of Virginia, and obnoxious to the constitutional provision above copied, had sentenced petitioner to imprisonment, and he sought, under *habeas corpus*, to be relieved from such imprisonment, on the ground that Judge Sheffey had ceased to be judge, by operation of the constitutional amendment above copied. Judge CHASE ruled that "persons in office by lawful appointment or election, before the promulgation of the fourteenth amend-

ment, are not removed therefrom by the direct and immediate effect of the prohibition to hold office contained in the third section. Legislation by congress is necessary to give effect to the prohibition by providing for such removal."

In *Pearce v. Pope*, 42 Ala. 319, the same principle was affirmed by this court. See, also, *Prater v. Darby*, 24 Ala. 496, overruling *Trotter v. Blocker*, 6 Por. 260.

It will be seen that the provisions of the Mississippi Comstitution, and of the fourteenth amendment, copied above, are much more nearly self-executing than sections 2 and 3, article 7 of our Constitution. Still, as affecting contracts made, or liabilities or forfeitures incurred, they were held to be inert and inoperative until, by legislation, vital force and energy were given to them.

It results from what we have said above, that from the time the Constitution of 1875 became operative—December, 1875—until the approval of the statute March 7th, 1876, although the powers of the senate to hear and try impeachment of the officers mentioned in sections 2 and 3 had been taken away, the necessary regulations did not exist to enable the courts of law to exercise the jurisdiction which had thus been taken away from the senate. Hence, during that interval, there was no tribunal clothed, or rehabilitated, with the active powers of which the senate had been disrobed, which could hear and determine cases arising under sections 2 and 3, article 7 of the Constitution.

The present proceedings are instituted under the act "to provide for the impeachment and removal from office of the officers mentioned in section 2 and section 3 of article 7 of the Constitution of Alabama," approved March 7th, 1876. See Pamph. Acts, 277. That is the first and only statute enacted, to give force and activity to the sections of the constitution therein named. Several of its provisions are assailed as unconstitutional, and, in this connection, it is contended for defendant that impeachment is a criminal prosecution, and that in construing said statute, we must conform to the rules which govern in the construction and administration of criminal enactments.

For the information, it is claimed that impeachment under our constitution is only a civil suit, and that the statute under discussion must be construed according to the rules applicable to civil remedies.

Impeachment, like most of our proceedings, civil and criminal, came to us from English jurisprudence. In England it was regarded and treated as the highest form of criminal prosecution. There, on conviction, the severest penalties of the law could be inflicted.—See Parliamentary History of

England, Vol. 26, 1218, *et seq.*; 4 Black's Com. 259; 2 Hale Pleas of Cro. 150; Comyn's Dig. Title, Parliament L.

Under the Constitution of Alabama, article 7, section 4, penalties in cases of impeachment "shall not extend beyond removal from office, and disqualification from holding office under the authority of this State, for the term for which he [the officer impeached] was elected or appointed."

The Constitution of the United States, artitle 1, section 3, subdivision 7, contains precisely the same limitations on the measure of punishment in impeachment as that found in our Constitution, save that the disqualification to hold office may, under it, be extended during the life of the offender.

Mr. Story, in his commentaries on the Constitution, section 688, after stating that in England "articles of impeachment are a kind of bill of indictment, found by the commons, and tried by the lords," adds: "In the Constitution of the United States, the house of representatives exercises the functions of the house of commons, in regard to impeachment; and the senate, the functions of the house of lords, in relation to the trial of the party accused. The principles of the common law, so far as the jurisdiction is to be exercised, are deemed of primary obligation and government. The object of prosecutions of this sort in both countries, is to reach high and potent offenders, such as might be presumed to escape punishment in the ordinary tribunals, either from their own extraordinary influence, or from the imperfect organization and powers of those tribunals. These prosecutions are, therefore, conducted by the representatives of the nation, in their public capacity, in the face of the nation, and upon a responsibility which is at once felt and reverenced by the whole community. The notoriety of the proceedings, the solemn manner in which they are conducted, the deep extent to which they affect the reputations of the accused, the ignominy of a conviction which is to be known through all time, and the glory of an acquittal which ascertains and confirms innocence,—these are all calculated to produce a vivid and lasting interest in the public mind, and to give to such prosecutions, when necessary, a vast importance, both as a check to crime and an incitement to virtue."

The same author, in section 798, says: "It is the boast of English jurisprudence, and without it the power of impeachment would be an intolerable grievance, that in trials by impeachment the law differs not in essentials from criminal prosecutions before inferior courts. The same rules of evidence, the same legal notions of crimes and punishments prevail."—See, also, sections 759, 764, 781; 1 Bish. Cr. Law,

§ 915 (362) ; 9 Appleton's Amer. Cyclopædia, 197 ; 4 Kent Com. (marg.) 289 ; Bouv. Law Dic. "Impeachment."

The authorities above hold that removal from office, and disqualification to hold office, are criminal punishment. But the doctrine has been carried much farther.

In *ex parte* Garland, 4 Wal. 333, it was shown that Mr. Garland had, before the war, been licensed to practice law in the federal courts. Having subsequently participated on the side of the Confederates in the war between the sections of the Union, the question was whether he should be allowed to practice his profession, without taking the oath prescribed by the act of congress of January 24th, 1865. That act declared that "no person shall be admitted as an attorney and counsellor to the bar of the supreme court, or to the bar of any circuit or district court of the United States," &c., "or be allowed to appear and be heard by virtue of any previous admission," &c., "unless he shall have first taken and subscribed the oath　.　.　that he has never voluntarily borne arms against the United States since he has been a citizen thereof; that he has voluntarily given no aid, countenance, counsel or encouragement to persons engaged in armed hostility thereto," &c. It was ruled by the court that to take away the right to practice law, guarantied to Mr. Garland by his license previously obtained, was punishment for past conduct; that it imposed a punishment for some of the acts specified, which were not punishable at the time they were committed, and to other of the acts it adds a new punishment to that before prescribed, and it is thus within the inhibition of the Constitution against the passage of an *ex post facto law.*" The only punishment which the act imposed, was a deprivation of the right to practice law in the United States courts.

To the same effect as the case above, and for the same reasons, are the cases of *Cummings v. State of Missouri,* 4 Wal. 277 ; *Ex parte Wm. Law,* 35 Geo. Rep. 303 ; *Impeachment of Andrew Johnson;* Rev. Code, § 3755 ; *Ex parte Dorsey,* 7 Por. 293. The case last cited was decided by this court near forty years ago, and has never been overturned. In his opinion, Mr. Justice GOLDTHWAITE says: "I have omitted any argument to show that disqualification from office, or from the pursuits of a lawful avocation, is a punishment; that it is so, is too evident to require any illustration; indeed, it may be questioned whether any ingenuity could devise any penalty which would operate more forcibly on society." Mr. Justice ORMOND concurred with him in the opinion that the statute they were construing, whose only

penalty was disqualification to hold office, or to practice law, was "highly penal."

We feel constrained to hold that impeachment, under our Constitution, is a criminal prosecution.

Section 7 of the bill of rights, distinguishes between criminal prosecutions, which may be conducted without indictment, and those which can be conducted only by indictment. In all cases falling within the latter class, the accused is entitled to a trial "by an impartial jury of the county or district in which the offense was committed." In cases falling within the former class, he has no right to demand a jury, unless some other clause of the constitution secures to him the right. Impeachment falls within the class first named; and in proceedings under section 2 of article 7, the accused has no constitutional right to demand a trial by jury. This conclusion is very much strengthened by the varying phraseology found in sections 2 and 3.

Certain rights, however, are guarantied to the accused *in all criminal prosecutions.* Among these is the right "to be confronted by witnesses against him." The inquiry arises, what is meant by the language, *confronted by the witnesses against him?* Evidently, the same meaning, scope and construction must be given to this clause, whether it arise in a criminal prosecution by indictment, or without indictment. The language precludes any other. If, then, we hold that depositions taken at a time and place where the accused may be present, and there confront the witness, may be used against him in a criminal prosecution, conducted without indictment, we are forced to hold that testimony thus taken can be used against him when he is tried on indictment. This would be repugnant to all our experience and notions of jury trials in criminal cases, and is equally opposed to the precedents and authorities on the question. The rule requires that the witnesses shall be produced in court, and there examined in the presence of the court, the jury and the accused.—See Sto. Constitution, § 1791; Whar. Am. Cr. Law, § 667; 1 Bish. Cr. Prac. § 1090; Cooley Cons. Lim. 318.

In the Impeachment of the Earl of Middlesex, in 1624, it is said the depositions of witnesses were merely read by the clerk.—1.Hallam's Cons. History, 364. Mr. Hallam remarks in regard to this, that the "fundamental rule of English law, which insists on the *viva voce* examination, was then unknown, or dispensed with in political trials."

There are a few exceptions to this rule, growing out of necessity. But the presence and *viva voce* examination of witnesses against the accused, is never dispensed with from mere motives of convenience, without the consent of the

accused.—See, for the exceptions, 1 Bish. Crim. Procedure, § 1099.

We hold, then, that testimony taken by examiners, not in the presence of the court, is not a compliance with section 7 of the bill of rights, notwithstanding the accused may have notice of time and place, and may be present at the examintion.

It is urged in support of the information in this case—

First, that the constitutional requirement above can be secured to the accused, by requiring the examiner to examine the witnesses in the presence of the court, where the defendant can and will be confronted by the witnesses against him.

Second, that if sections 6, 7 and 8 of the act of March 7th, 1876, be unconstitutional, the only effect is to expunge them from the statute; and this court will then be left in possession of the common law power, incident to all courts of original jurisdiction, of calling witnesses before it, and there examining them *viva voce*.

To the first of these positions we answer, the language of those sections clearly and explicitly forbids such construction. The examiner may be appointed "in term time, or vacation," by the court, or a justice thereof; he must take and certify the evidence, "by such day as may be fixed in said order of appointment"—and "the charges shall be tried by the court on such evidence so taken and certified." The examiner has power "to compel the attendance of witnesses by attachment, and to punish for contempt by fine or imprisonment in the county jail, and to administer oaths to witnesses." And, "from the rulings of the examiner on any question of the admissibility and legality of evidence offered, either party may reserve an exception, to be decided by the supreme court." The unmistakable intention of the legislature, as gathered from this language, was that the testimony should be taken and certified by the examiner apart from the court; and we could not call witnesses before us, without doing violence to many of the provisions of the statute.

Answering the position stated second above, this is not a court of original jurisdiction, save in a few specified cases. To summon witnesses before us, and examine them *viva voce*, is not one of the common law powers of this court.

But the following is a full and complete answer to each of said positions. The Constitution requires us to try impeachments "under such regulations as may be prescribed ly law." The directions found in sections 6, 7 and 8 of the statute we are considering, are the regulations which the legislature has prescribed. Whether constitutional or otherwise, they are

[Briarfield Iron Works Co. v. Foster.]

the only regulations furnished us, on the several subjects embraced therein. If constitutional, we are bound to follow them. If unconstitutional, then we are, to that extent, without regulations, unless we provide them ourselves. These would not be regulations prescribed by law.

The demurrer is sustained to each count of the information, and the same is quashed.