56 So.2d 102

### STATE ex rel. GARRETT, Attorney General v. McPETERS, Sheriff.

### 8 Div. 618.

Supreme Court of Alabama.
Nov. 13, 1951.

Rehearing Denied Jan. 10, 1952.

Si Garrett, Atty. Gen., and Bernard F. Sykes, Asst. Atty. Gen., for the State.

Jas. H. Butler, Jeff D. Smith, Wm. H. Johnston and Smith Johnston & Butler, Huntsville, for respondent.

PER CURIAM.

The Defendant is found guilty as charged in the information and an order is

hereby entered ousting him from the office of Sheriff of Madison County, Alabama.

LIVINGSTON, C. J., and SIMPSON, STAKELY and GOODWYN, JJ., concur.

BROWN and FOSTER, JJ., dissent.

LAWSON, J., not sitting.

BROWN, Justice (dissenting).

This is an information filed by the Attorney General based on the recommendations of a grand jury impaneled in the circuit court of Madison County, seeking the impeachment of the defendant and his ouster from office on the ground that he is "guilty of corruption in office" in that "the sheriff accepted bribes in checks and cash from one Edward Snipes with an agreement or understanding that the sheriff would not molest or interfere with or harm the operation of slot machines located in the Elks Club in Madison County, Alabama."

The law is settled that this proceeding is criminal in nature and character and is governed by the rules applicable to criminal prosecutions. The State must prove the charge on which the proceeding is based *beyond a reasonable doubt.* State ex rel. Johnson v. Lovejoy, 135 Ala. 64, 33 So. 156; State ex rel. Attorney General v. Robinson, 111 Ala. 482, 20 So. 30; State ex rel. Attorney General v. Talley, 102 Ala. 25, 15 So. 722; State ex rel. Attorney General v. Savage, 89 Ala. 1, 7 So. 183, 7 L.R.A. 426; State ex rel. Attorney General v. Buckley, 54 Ala. 599.

The testimony was given *ore tenus* and much of it is without dispute. It shows that the defendant was elected to office by a large majority, and this was stated in argument at the bar, and not disputed. He qualified and took over the office of sheriff on January 16, 1951; his family consisted of a wife and four children and before his election he was a tenant farmer. He was, at the time he qualified, without funds to maintain his family, was in necessitous circumstances, and was without means to purchase vehicles for himself and his deputies to perform the duties of the office. With the aid of Mr. Woodard, a retired merchant and licensed bondsman, he procured a loan to make the first payment on the automobile. This loan was secured by the signature of the defendant's father and other friends. The balance on the purchase of the automobile was to be paid on the installment plan. He later procured another loan from the First National Bank through the aid of Woodard, who signed as surety. The defendant was without shelter for his family and contracted to buy a house on the monthly payment plan.

The income from the office to which the defendant had been elected was, as a result of the long tolerated pernicious fee system, frozen in favor of his predecessor in office and for months it was impossible for defendant to pay his employed help in due course and without delay. He was not an educated man, having left school after the sixth grade. However, as the undisputed evidence goes to show, he was a man of good character and believable on oath.

This evidence presents a typical victim for the jackals of greed and corruption who "toil not neither do they spin," (Matthew 6: 28) except at the handle of a "one armed bandit," and feed upon the take.

Before the time came for the defendant to take over his office, one Talley, an intimate friend and stooge of Ed Snipes, wormed his way into defendant's confidence and was appointed chief deputy. He immediately suggested that Snipes desired to give the sheriff a Christmas present and did, through said Talley, give the defendant twenty dollars, which defendant gave to his wife to buy groceries for the family.

We next find that Snipes rented Talley a house which was in the process of being built on Montesano, near his own, and that the sheriff was employed to aid Talley in completing the building.

We next find Snipes offering to advance money as a loan to the defendant in installments. The first installment was evidenced by Snipes' check, with the word "loan" written across its face. Another installment was by check of Snipes on the Henderson National Bank, delivered during business hours and in the open, which defendant endorsed and cashed in the pres-

ence of Snipes. The next advancement of $100 was offered over the telephone by Snipes to the defendant and defendant sent Talley, his deputy, to pick it up. That was in the amount of $100 and was delivered by Talley to the defendant.

The witness Woodard testified that while he was endeavoring to procure a loan for defendant to make a down payment on the automobile and further effort to aid the defendant, Snipes stated that he had made these advancements to the defendant as a gift.

The testimony of the witness Broadway that he paid defendant sums of money for protection is of little or no probative force. What followed? As soon as the defendant got his feet on the ground, so to speak, Broadway was arrested and convicted for operating a gambling place and his appeal is now pending in the circuit court of Madison County. The defendant discharged Talley for misconduct in office, being drunk while raiding "Joe's place" operated by Broadway.

The defendant as sheriff, within three and one-half months after he qualified, raided all the known places in Madison County where slot machines were operated and removed the machines to the county jail for condemnation.

There is evidence clear to the effect that Snipes made a concerted effort to entrap the defendant into an agreement and at best his evidence leaves the matter of an agreement in uncertainty as to the promise of protection, and defendant denies any such agreement was made and testified that he received and accepted the advancements by Snipes as a loan without any such agreement or understanding. The evidence further shows that the first grand jury investigating the matter did not recommend impeachment.

After listening to the testimony, the able argument by the Attorney General and his assistant, and the argument of counsel for the defendant, I am not satisfied beyond a reasonable doubt that the charges made in the information for impeachment have been established by the prosecution and, therefore, am of opinion that the defendant should be acquitted of said charges.

FOSTER, J., concurs in the foregoing.

## On Rehearing

### PER CURIAM.

The information of impeachment filed in this court by the Attorney General charged William O. McPeters, as sheriff of Madison County, with corruption in office and the commission of an offense or offenses involving moral turpitude—bribery proscribed by § 64, Title 14, Code 1940, as amended by Act No. 582, General Acts 1943, p. 584.

In recent years opinions in such cases have not been promulgated by the court, but on account of the one here filed by the dissenter, the court is put to the necessity of stating its views in holding the information competently proven by the evidence adduced ore tenus at the hearing.

The charge of corruption in office contains but one specification to the effect that William Oliver McPeters was elected and entered into the office of sheriff January 16, 1951, and that prior to that time after he had been elected, he entered into an agreement or understanding with one Edward Snipes that for the payment to him of $1,000 by said Snipes that he, McPeters, when he entered the office of sheriff, would in effect give protection to the possession and operation of slot machines in the Elks Club in Huntsville and other places in the county. The specification further avers that pursuant to that agreement the said Snipes, who was a mechanic who worked on the said slot machines, paid McPeters the sum of $200 by a check; that about February 3, 1951, Snipes delivered to the sheriff another check in the amount of $300, both of which checks McPeters cashed; that another sum of $100 was thereafter paid in cash by Snipes to McPeters through his deputy sheriff, Robert Talley; all of said payments having been made in accordance with the understanding aforesaid, for the corrupt purpose of influencing the sheriff's action in a matter then pending before him, that is, whether or not he would seize, remove and have condemned as pro-

vided by law the said slot machines. The specification then avers that another agreement was made between these parties whereby Snipes would pay the sheriff $50 per week for the privilege of operating slot machines in the Elks Club and other places in Madison County and that on several occasions cash amounts were paid by the said Snipes to the sheriff in pursuance of this agreement, the same being made at approximately weekly intervals from the month of March until the end of April, 1951, and that because of the said cash payments and the said checks by the said Snipes to McPeters, he, as sheriff, did refrain from molesting or interfering with the said slot machines and that the machines were operated or used for gambling purposes from January 16, 1951, the day the sheriff took office, until May 1, 1951.

Charge 2 of the information covers the same ground as Charge 1, but includes thirteen specifications, each involving a sparate payment by Snipes to McPeters involving either checks or cash, the said specifications being based on the commission of an offense or offenses involving moral turpitude by violation of the aforesaid bribery statute.

The court is clearly of the opinion that the charges were sufficiently proved in accordance with the rule in such cases. We were impressed with the verity of the testimony of Snipes, as well as most of the other witnesses who testified, usually rather reluctantly and without apparent animosity to the sheriff, in substantiation of such charges. Abe Pizitz, the Exhalted Ruler of the Elks at the time under consideration, testified as regards his agreement with Snipes for the payment of the $50 per week take from the machines to pay for the sheriff's protection, which was corroborated by one Pulley Mills, the manager of the Elks Club at that time. Talley, McPeters' chief deputy sheriff from January 16 to March 25, corroborated the testimony of Snipes. He was present at the house of Snipes when the sheriff-elect and Snipes entered into the agreement and heard the conversation and corroborated the fact of the delivery by Snipes to McPeters of the first $200 check dated January 10, a few days after the effectuation of this agreement. Talley further corroborated the payment of $100 cash by Snipes to the sheriff in February. There was other corroborating testimony which we deem unnecessary to burden the opinion with, but we will mention the testimony of Loyas Branum, who was the last chief deputy sheriff of McPeters and who held that office when the hearing took place before this court. Branum testified that about March 25 or 26 the sheriff came by his filling station in Huntsville, where he was employed, and offered him the position of chief deputy sheriff, telling him that Talley had messed him up by raiding Joe's Place; that he, Branum, refused the position but several days later the sheriff returned and renewed the offer and that in addition to his regular $175 monthly salary, said he could have 20% of the take from the gambling concessions; that he had already gotten $600 from Snipes and two checks; that he knew a gambling table was being operated at Joe's Place and that Talley, his former deputy, wanted too much, 50% of the take. We cannot rationalize such testimony by the respondent's own chief deputy with any theory of innocence.

Pulley Mills, the manager of the Elks Club, together with Snipes, would "rob" the slot machines in the Elks Club each week for the takeout money and on one occasion Mills was present when Snipes telephoned the sheriff from the Elks Club that he had $200 and was ready to deliver the money and that after he heard Snipes say, "Mac, I have got your money," Snipes took the $200 and left from the Elks Club with the announced purpose of going to the sheriff's office and deliver the money. Snipes testified he did so.

McPeters admitted cashing the two checks mentioned in the first specification and receiving some of the other money from Snipes, including the $100 in cash charged in said specification, but claimed it was a loan in order to help him get started in the sheriff's office. We are not impressed with this explanation. He testified that before he took office, but after election, he refused overtures from Snipes and others to give protection to the slot machine and

other illegal operations; yet knowing that Snipes was a slot machine operator, he was willing to take the so-called loans to which we have referred. Another circumstance which weighs considerably against the respondent is his dealings with Broadway, a known gambling operator, mentioned in the dissenting opinion. Broadway claims he paid for protection, but the sheriff says any money he so received was for Christmas presents for his children. These associations and the sheriff's conduct in regard to them to the unbiased mind cannot be satisfactorily explained so as to square with the required standard of innocence of the chief law enforcement officer of the county. The explanation may be ingenious but not ingenuous, and in our view but the most naive could give satisfactory credence to it. We are persuaded that the trouble broke when Gordon A. Stewart, chief deputy to McPeters at the time the Elks Club was raided on May 1, 1951, just prior thereto told the sheriff that the sheriff of an adjoining county was criticizing McPeters for allowing slot machines to operate in the county and that he was the only sheriff in north Alabama who allowed it. Considerable heat was being generated by the open and notorious operation of gambling devices and gambling establishments and we are persuaded that the raid carried on by the sheriff on the Elks Club was in order to throw his accusers off guard and present the appearance of undertaking law enforcement, whereas it would seem that the result perhaps precipitated the accusation of the citizens against him which finally led to the grand jury investigation. There were too many witnesses who testified to too many incriminating circumstances to lead the impartial mind to any other conclusion but that the unfortunate respondent was guilty of the specifications charged, and we cannot rationalize any theory of innocence. Indeed, as observed, the testimony of the sheriff's own deputy sheriff at the time of the hearing here, Branum, strongly sustains such a conclusion.

Perhaps we should give some attention to the dissenting opinion. First, we do not think the State's witnesses are subject to the critical diatribe leveled against them in the opinion. True, Snipes, Broadway, and some others were engaged in business beyond the pale of the law, but their testimony was not satisfactorily impeached and no witness was proffered to discredit their testimony by proof that they were unworthy of belief. It is but common knowledge that if unlawful dealings such as were charged against the sheriff are to be discovered and broken up, the evidence must come from such persons.

Finally, while we cannot say that we altogether approve the system which places this unpleasant duty upon this court by trying an officer away from his county, it is a duty which comes to us *cum onere,* and the whole case considered, we concluded as to the guilt of the defendant on both charges, resulting that an order was entered ousting him from office.

The affidavit filed on rehearing is merely cumulative and not sufficient to induce a different conclusion, so the rehearing must be denied.

Application for rehearing overruled.

LIVINGSTON, C. J., and SIMPSON, STAKELY, and GOODWYN, JJ., concur.

BROWN and FOSTER, JJ., dissent.

LAWSON, J., not sitting.